169 N.J. Super. 280 (1979)
404 A.2d 1182
JACOB ROTH, T/A HIGHWAY CHECK CASHING SERVICE, PLAINTIFF-APPELLANT,
v.
FIRST NATIONAL STATE BANK OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 21, 1979.
Decided June 20, 1979.
*282 Before Judges CONFORD, PRESSLER and KING.
Mr. Ernest Prupis argued the cause for appellant (Messrs. Weltchek, Prupis & Ritz, attorneys).
Mr. Alan D. Wiener argued the cause for respondent (Messrs. Raff and Schneider, attorneys).
The opinion of the court was delivered by CONFORD, P.J.A.D. (retired and temporarily assigned on recall).
Plaintiff, a depositor in defendant bank, sued the bank for loss of a large sum of cash just withdrawn by him, as the result of his being robbed as he left the bank. The culprits were tipped off as to the robbery opportunity by a friendly teller at the bank who was aware of plaintiff's daily morning habit of withdrawing substantial cash for use in his check-cashing business. The trial judge, sitting without a jury, found for defendant as of the end of the plaintiff's case as well as at the end of the entire case,[1] on the ground *283 that the teller's action was not in the course of her employment. The judge also rejected an alternative contention by plaintiff that defendant breached a voluntarily undertaken duty of escorting plaintiff from the bank door to his car.
The parties do not disagree as to the facts, set forth hereinafter, which are consistent with the findings of operative fact made by the trial judge.
Plaintiff Jacob Roth had a check cashing business in South Kearney. At the end of each day he took all of the checks which had been brought to him for cashing and wrote out a check of his own for the amount of money he wanted to cash the next morning for use in his business. The following morning he would go to the bank at about 8:45 to deposit the checks he had taken in and to cash the check he had written on his own account.
Plaintiff followed his usual practice on the morning of July 24, 1974. He arrived at the bank at about 8:45, and a guard at the door, as usual, accepted the checks and gave them to a teller. The check he had written that morning was for $72,000. Plaintiff then went to a luncheonette to wait until the bank opened. He returned to the bank at 9 A.M., went to the head teller, and received a brown paper package from her. He proceeded to the door, and someone grabbed him from behind and held a knife to his throat. Another man grabbed the package and the two men escaped.
The police eventually arrested certain people and recovered a little over $15,000 in cash. Thus plaintiff lost $56,908, for the recovery of which this action was instituted.
Plaintiff had been cashing his checks at this branch of the bank for about 14 years and he went there at least once every weekday. For some time the regular bank guard, Willie, had always escorted plaintiff to his car with his gun drawn. But he had been out sick for several weeks. There was another guard, but he never walked plaintiff to the car. Plaintiff acknowledged that he never asked that guard to do that and never complained to the bank about the unavailability of a guard.
*284 Long before the robbery, plaintiff had arranged to have a police escort. A police officer would meet him either at the bank or at a designated point about a mile away from the bank and would follow him to his place of business with a radio car. That arrangement had gone on for a number of years, and an officer had met Roth practically every day. On the day of the robbery, however, Roth did not wait for the officer.
An individual named Morse had a "girlfriend," one Connie Walker, who worked at the bank as a teller. She told him about plaintiff's custom of withdrawing large sums of cash from the bank on a regular basis. She described plaintiff and his car to Morse, and Morse subsequently made a confirmatory observation of plaintiff leaving the bank. Morse and Walker "jokingly" discussed how "it would be nice to have that sort of money." In June or July 1974 Morse transmitted the information about plaintiff to one Lambert who, along with two confederates, committed the robbery on July 24, 1974.
There is no evidence that Walker as teller handled plaintiff's withdrawal transactions, either generally or on the occasion in question.

I
Plaintiff's basic claim is that defendant bank owed him a duty of confidentiality as to his activity as a depositor and that it violated that duty through the conduct of its employee, the teller Walker, described above. The trial judge found that Walker's disclosure to Morse was a proximate cause of plaintiff's loss, albeit he did not conclude for liability of defendant.
It must be conceded that there is a generally recognized obligation of confidentiality in respect of a depositor's financial relationship with a bank. 10 Am. Jur.2d, Banks, § 332 at 295; 5A Michie, Banks and Banking, (1973) c. 9, § 1 at 18 (1973) ("Deposits"); Peterson v. Idaho First Nat'l *285 Bank, 83 Idaho 578, 367 P.2d 284 (Sup. Ct. 1961); cf. Commercial Union Ins. Co. v. Burt-Thomas-Aitken Constr. Co., 49 N.J. 389 (1967). If Walker's conduct could be regarded as within the scope of her employment, there might well be a case of liability. But a thorough consideration of the law, in the light of the facts at hand, satisfies us that Walker's act was not within the scope of her employment.
The term "scope of employment," for present purposes, is an elastic one, and none of the commonly found definitions thereof can be relied upon with assurance either for negative or affirmative absolute criteria of liability. As perceptively stated by Prosser:
But his [employer's] vicarious liability, for conduct which is in no way his own, extends to any and all tortious conduct of the servant which is within the "scope of the employment." This highly indefinite phrase, which sometimes is varied with "in the course of the employment," is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility in decisions. It is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not. It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment. [Prosser, Law of Torts, at 460-461 (1971)]
Our Supreme Court has referred to 1 Restatement, Agency 2d, § 228 at 504 (1958), as summarizing the conventional rule to the following effect:
(1) Conduct of a servant is within the scope of employment if, but only if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master, and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

*286 (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.
See Commercial Union Ins. Co. v. Burt-Thomas-Aitken Constr. Co., supra, 49 N.J. at 392, n. 1.
See also, McAndrew v. Mularchuk, 33 N.J. 172, 190 (1960); Snell v. Murray, 117 N.J. Super. 268, 273 (Law Div. 1971), aff'd 121 N.J. Super. 215, 216 (App. Div. 1972); Gindin v. Baron, 11 N.J. Super. 215 (App. Div. 1951.) Ordinarily, if the employee deviates from the business of his employer and, while in the pursuit of his own ends, commits a tort, the employer is not liable. However, an act may be within the scope of employment although consciously criminal or tortious, 1 Restatement, Agency 2d, § 231 at 512, as where done for the master's purposes or reasonably expectable by the latter. See Gindin v. Baron, supra. A catalogue of pertinent factors is listed in 1 Restatement, Agency 2d, § 229 at 506.
A special situation of liability on respondeat superior principles for outrageously criminal conduct not serving the employer's purposes is found in the cases, relied upon by plaintiff, imposing liability on a sleeping car company for sexual assault by a porter on a passenger. See Berger v. Southern Pacific Co., 144 Cal. App.2d 1, 300 P.2d 170 (D. Ct. App. 1956); Annotation, 60 A.L.R.2d 1115 (1958). There liability is said to be based on such a company's special duty of exercising a high degree of care for the safety and comfort of its passengers and the fact that fulfillment of that duty is committed to the tortfeasor porter. See Berger v. Southern Pacific Co., supra, 300 P.2d at 173. The principle has, however, in some cases been extended to any employee of the company whose duties relate to the car in which the passenger is travelling. Annotation, 60 A.L.R.2d, at 1116-1117. Some elements of the just stated rule have been held applicable to hold an employer where an employee assaults a business invitee, without regard to the *287 relevance of the assault to the service of the master's purposes or needs. See Annotation, 34 A.L.R.2d 372, 378-379 (1954).
A fair consideration of the rationale of the scope-of-employment principle will not accommodate defendant's liability here. Not only was the employee's act outrageously criminal, and not in any sense in the service of the employer's interests, but she had no apparent connection with the effectuation of the transactions by which plaintiff made his withdrawals of cash. Walker's knowledge was seemingly a mere matter of observation on her part. Finally, the tort itself, the "tip" to Morse, was not shown to have occurred within the time-space ambit of the employment. See 1 Restatement, Agency 2d, § 229 (2) (b). In short, to use the language of Prosser, the "unordered and unauthorized acts" of the servant in this case are not such that it should be found, as between the plaintiff and the defendant, "expedient [as a matter of justice] to charge the master" with liability therefor. Prosser, Law of Torts, at 460.
Plaintiff presses for a favorable result by invoking the contractual relationship between the bank and him and urging he has sustained a breach of contract. This approach does not advance his cause. In this factual context, it is still necessary for him to demonstrate that the act of the employee was authorized. Here it certainly was not.

II
Plaintiff concedes that defendant generally had no duty to protect its customers once they left the premises. Nevertheless, he says that defendant had regularly supplied such protection for him and that when the replacement guard failed to escort him to his car there was a breach of a duty voluntarily assumed by defendant for which he should have redress in damages. The judge held that the bank had at one time assumed such a duty but that at the time of the robbery that assumption had ceased and hence there was no duty to be breached.
*288 Clearly the judge was right. Whatever duty the bank had assumed voluntarily it had abandoned long before the robbery occurred. Plaintiff acknowledged that the former guard, Willie, had been gone for at least two weeks, and defendant's witness said that he had been gone two months. Plaintiff knew that the new guard did not provide protection beyond the doors of the bank. Yet he never asked for protection and never complained that the protection Willie had provided had been withdrawn. He knew that a Newark police officer was generally available to escort him and had been available for several years. Still he did not wait for that officer on the morning he was robbed.
There is thus sufficient evidence to support the trial judge's conclusion that at the time of this robbery the bank was under no voluntary duty to protect plaintiff. There is no cause of action on this theory.
Judgment affirmed; no costs.
NOTES
[1] The judge deferred action on defendant's motion for dismissal at the end of plaintiff's case and received evidence on behalf of defendant before ruling.