270 N.J. Super. 1 (1994)
636 A.2d 527
CHARLOTTE GLOWACKI, PLAINTIFF-RESPONDENT,
v.
UNDERWOOD MEMORIAL HOSPITAL, DEFENDANT-APPELLANT. CHARLOTTE GLOWACKI, PLAINTIFF-APPELLANT,
v.
UNDERWOOD MEMORIAL HOSPITAL, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1993.
Decided January 10, 1994.
*5 Before Judges SHEBELL, LONG and LANDAU.
Thomas J. Walsh argued the cause for defendant-appellant and defendant-respondent, Underwood Memorial Hospital (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, Jr., of counsel; Mary Ann C. O'Brien on the brief).
Theresa C. Grabowski argued the cause for plaintiff-respondent and plaintiff-appellant, Charlotte Glowacki (Weinberg & McCormick, attorneys; Ms. Grabowski on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
These two appeals, which we have consolidated for purposes of this opinion, arise from jury verdicts in a slip-and-fall case which were entered following separate trials on liability and damages. We affirm both as to liability and the damages awarded to plaintiff by the jury of $771,800, plus pre-judgment and post-judgment interest as allowed by the trial judge.
On August 20, 1984, plaintiff, while employed as a pediatric transport nurse for a Philadelphia hospital, was transporting a critically ill baby from defendant, Underwood Memorial Hospital (Underwood), in Woodbury, New Jersey. An isolette was needed for this purpose. This piece of equipment weighed approximately 200 pounds and was on wheels. Part of plaintiff's responsibilities was to wheel it out to the ambulance, lower its wheels and then lift it up, with the help of the ambulance driver, into the ambulance.
The ambulance arrived at Underwood at about 11:30 p.m. and drove to the emergency room area where it backed up to the loading platform. The back of the ambulance made contact with hard rubbery pieces which jutted out from a wooden bumper. The wooden bumper was separated from the concrete loading platform by intermittent rubber blocks, which left an open space of approximately three and one-half inches between the bumper and the dock for a substantial distance between each rubber block. *6 Plaintiff stepped from the ambulance directly onto the concrete platform. Although the area was lit, it was not that bright, as the lights were yellowish-orange and there were some shadows.
It took plaintiff and the doctor approximately two hours in the hospital to secure the baby, whose condition had to be stabilized before it could be transported. Plaintiff then started back to the ambulance with the baby in the isolette. At the loading platform, she and the driver began the process of lifting the isolette up into the ambulance. The distance or height to the back of the ambulance appears to have been approximately one foot.
During this process, plaintiff took a step with her right foot and then moved her left foot. This foot became wedged into the space between the wooden bumper and the concrete platform. The space was alleged by the plaintiff to be as wide as her shoe, causing the foot to become wedged beyond her ankle. Plaintiff explained that she could not see through the isolette and that when she lifted it up, her feet were actually underneath a tank on the isolette. Plaintiff had to shift her body to level out the isolette so it would not tilt in order that nothing would happen to the baby. She and the driver had to put the isolette back down on the concrete dock until plaintiff could free her foot. Plaintiff knew that she had done something to her back, but her concern was for the baby. Although she did not report the incident to Underwood, the next day at work she did tell her supervisor.
A civil engineer testified at trial as an expert on behalf of plaintiff. He acknowledged that there were no standards in the industry specifically for hospital loading docks and that no standard in the industry had been violated. He stated that standards for loading docks depended on the size of the vehicles using the docks, not the type of cargo being loaded. His opinion was that defendant's loading dock itself was not unusual and was designed to protect against damage from trucks. He distinguished the situation here because this was a "people-loading," not "cargo-loading," facility. Because those who used this dock would have to pay more attention to their patients than to their own feet, he *7 opined that it was unsafe to have a hole or gap in the bumper system. This could be eliminated by putting a solid rubber bumper along the face of the dock. Another alternative was to eliminate the dock altogether and install a ramp.
He measured the gap between the concrete platform and the wooden bumper to be three and one-quarter inches wide and three feet long. He testified that under OSHA standards, a floor hole was defined as anything between one inch and twelve inches. Such a hole had to be protected with a cover that was capable of supporting 200 pounds of weight. Although the OSHA standard appeared to relate only to the floor holes, plaintiff's expert interpreted the configuration here to be very much like a floor because it was a flat horizontal system on which people walked. He opined that it created an unreasonable hazard to users and a dangerous condition on the premises.
Defendant moved for a directed verdict immediately following this expert's testimony. Defendant argued that plaintiff's only claim was one of defective design and that her expert had just conceded that all design standards were met. Plaintiff pointed out that her complaint also alleged a hazardous condition on the property that created an unreasonable risk of harm to invitees. The trial judge granted defendant's motion only as to issues of "products liability." He thereby limited plaintiff's case to the issue of whether defendant had invited people onto its premises for carrying on certain operations and whether its premises were safe for those operations.
Defendant produced a civil engineer who confirmed that there was no standard in the industry applicable to hospital bumpers. He explained that the purpose of the bumper system was to protect both the platform and vehicles from damage, and that this wooden system was very common in the 1960's. According to this expert, the rubber bumpers were designed to afford enough flexibility so that when a vehicle hit the bumper, the wood could bend and absorb the shock. He admitted that any design should consider the nature of traffic going over it. He, nevertheless, *8 opined that the system here did not create an unreasonable hazard of tripping or falling. Defendant's director of plant operations conceded that defendant was aware of the spaces in the bumper system, but indicated there had never been a report of an incident since it was built in 1968 or 1969.
The court charged the jury on principles of ordinary negligence and the liability of a property owner to business invitees for a dangerous condition on its property. The jury was also charged on contributory negligence and was given an ultimate outcome charge. The jury returned a verdict finding that an unsafe condition existed on defendant's platform and that defendant was negligent, which negligence was a proximate cause of plaintiff's accident. The plaintiff was found also negligent, which negligence was a proximate cause of the accident. Defendant was found eighty-five percent negligent and plaintiff was found fifteen percent negligent.
The trial on damages revealed that the thirty-eight-year-old plaintiff was an only child, never married, and lived with her parents, ages seventy-seven and seventy. Her mother's health was not good.
Plaintiff testified that when she went home following the accident, she took some Tylenol and went to bed. She awoke later in the morning feeling more achy. She went to work, but had her trainee do all of the lifting and pushing. By the end of her shift, she was sore and stiff and filed a report with the nurse at work. She had pain radiating down the back of her leg and into her knee and could not even get up from a chair.
After plaintiff, who had some prior history of back pains, got home, she felt a sharp shooting pain like none she had ever felt before. She could not sit, stand, or walk and everything hurt her. The following day, August 22, 1984, she saw her physician of more than thirty years. The doctor x-rayed plaintiff's back and prescribed a back brace for her as well as some medication. During the next week, plaintiff got out of bed only to use the bathroom and was totally dependent upon her parents.
*9 On August 29, 1984, the doctor again x-rayed plaintiff and admitted her to the hospital where she stayed until September 18, 1984. While in the hospital, plaintiff was placed in pelvic traction. She had more x-rays, a CAT scan and EMG, physical therapy, heat packs, and ultrasound treatment. Plaintiff's diagnosis upon release was "herniated nucleus pulposus [disc]." This was based on her clinical symptoms of pain, tenderness, spasm, and numbness.
After being discharged, plaintiff was unable to walk much and had no leg strength. A full back brace as well as a hospital bed for her home were prescribed. She could not drive until November. She was out of work from August 21 to November 20, 1984, when she went back to work for only five-and-a-half hours per day. Because a weight-lifting restriction of ten pounds was imposed by the doctor, she was put on desk work. Her hours were gradually increased, but she was still doing only paperwork. In February 1985, she started working an eight-hour day, twice a week, and then in June she increased it to three days a week. Her hourly wage rate was reduced.
In September 1985, plaintiff was readmitted to the hospital for a period of two weeks. She returned to work two weeks after being discharged. She again was restricted to paperwork and eight-hour days, three days a week. Plaintiff was unhappy doing desk work, because she wanted to take care of children as she had been trained to do. As a result, she became depressed. Plaintiff was never able to return to pediatric nursing.
Around the middle of 1986, plaintiff started a rehabilitation program to increase her chances of returning to her former work. She stayed in the program until March 1987, but did not improve significantly and never regained her weight-lifting ability. She returned to work four days a week, again doing desk work. In 1989, she began working thirty-seven-and-a-half hours a week, but never resumed her twelve-hour shifts. As of the date of trial, she was earning $30,000 per year. At the time of trial, the salary for a *10 pediatric transport nurse working the twelve-hour shift was $52,281 per year.
Plaintiff's treating physician, an orthopedic surgeon, in referring to the MRI of plaintiff's spine explained that it appeared darker at the fourth lumbar disc. In the doctor's view, this disc was crushed and instead of herniating to the posterior, as usually happens, it went down into the body of the next disc. The fact that it was not a posterior protrusion explained why other diagnostic tests had been inconclusive. The doctor, when asked when she came to this understanding of the MRI, responded that it was after she had reviewed plaintiff's case and discussed it with a radiologist at Bryn Mawr Hospital. The treating doctor felt that plaintiff would continue to have back problems for the rest of her life and that she would not be able to return to full-time nursing.
A rehabilitation psychologist testified as plaintiff's vocational expert. He saw plaintiff in August 1990, and administered an aptitude test, an interest test, and a personality test. He opined that plaintiff was not capable of returning to her former job because of the weight-lifting restrictions. Her current position of logistics control coordinator was deemed compatible with her current abilities.
Plaintiff also presented the testimony of an actuarial economist. He testified that plaintiff's life expectancy was 42.1 years and her working life expectancy was 26.9 years to 31.9 years, depending on retirement age. He asserted that as a registered nurse from 1984 to the date of trial, plaintiff could have earned $352,882, whereas, she actually earned only $193,528, a difference of $159,354. After allowing for income taxes, the net difference to plaintiff was $111,548.
With regard to future lost earnings, this expert explained that the current $19,000 difference between plaintiff's actual earnings and what she could have been earning was, after income taxes, actually $13,497. He pointed out that her salary would be increasing over the next thirty years, but that the jury had to allow for present value. To account for both trends, he suggested that the *11 jury use a "net interest rate," of between one and three percent, i.e., the difference between the growth due to inflation and other factors (approximately four to five percent) and current interest rates (approximately seven percent). The expert showed the jury how to use published tables to find the appropriate numerical factor using a net interest rate of two percent. That factor, until retirement at age sixty-five, was 20.6. Multiplying $13,497 by 20.6 yielded lost future earnings of $278,038. A similar procedure using age seventy yielded lost future earnings of $315,830.
Plaintiff's expert estimated plaintiff's lost fringe benefits to the time of trial to be $15,935, based on a factor of ten percent of wages. Her future lost fringe benefits then were either $39,717 (to age sixty-five) or $45,115 (to age seventy). He also discussed plaintiff's lost household services, i.e., her ability to cook, iron, launder, shop, and clean for herself. He estimated that the amount of time spent on these activities would be twenty-five hours weekly for a single working person. He then used the Department of Labor figures for the hourly rate for a home health aide, which was $6.75. This yielded a cost to plaintiff of $8,775 per year, for a total future loss of household services of $248,333. The expert was asked to total up all of his figures, however, defense counsel's objection was sustained.
Defendant retained an orthopedic surgeon who examined plaintiff on two occasions, once on August 26, 1988, and again on October 23, 1991. He testified that his impression as of 1988, was low back strain with some underlying degenerative changes about the lumbar spine. He found no demonstrative evidence of a lumbar disc, no clinical or radiographic evidence of a significant permanent disability, and no substantiation of any fracture. His diagnosis as of 1991, was similar to his earlier diagnosis. He found back strain with some underlying degenerative changes, no clinical evidence of cervical or lumbar disc or nerve root irritation, and no objective, clinical or radiographic evidence of significant permanent disability.
*12 The defense also presented the testimony of another orthopedic surgeon, by means of a videotaped deposition. He had examined plaintiff on October 26, 1987, on behalf of her employer. Based on his physical examination of plaintiff's lumbar spine and a neurological examination of her lower extremities, he believed that plaintiff was capable of returning to full-time employment. His diagnosis was lumbar strain of moderate intensity. He defined lumbar strain as the pulling of muscles around one's spine. On cross-examination, he admitted that he placed a weight-lifting restriction of twenty-five pounds on plaintiff. However, he claimed that this restriction was based solely on plaintiff's subjective complaints, not on anything objective.
Our review of the entire record satisfies us that defendant's contentions that the trial court erred in denying defendant's motion for a new liability trial, or in the alternative, for judgment notwithstanding the verdict are clearly without merit. R. 2:11-3(e)(1)(B), (C), and (E); see Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). Defendant's argument that the court erred in denying its motion to limit its liability to $10,000 pursuant to the charitable immunity statute, N.J.S.A. 2A:53A-7, is also clearly without merit. R. 2:11-3(e)(1)(E). Plaintiff was not a beneficiary within the contemplation of the statute. See Mayer v. Fairlawn Jewish Ctr., 71 N.J. Super. 313, 177 A.2d 40 (App.Div. 1961), aff'd in part and rev'd in part on other grounds, 38 N.J. 549, 186 A.2d 274 (1962).
We reject defendant's assertion that the assignment judge erred in allowing plaintiff to add "new experts to a case which was already tried as to liability, was scheduled to be tried as to damages, and was adjourned and delayed at plaintiff's request." There was no abuse of judicial discretion under R. 4:17-7.
The liability trial ended in June 1989. A damages trial was aborted in October 1989, due to the failure of plaintiff to supply the defense with all of her treating doctor's records. By case management order of February 15, 1990, plaintiff was ordered to supply all medical records to defendant by June 1, 1990. On April *13 4, 1990, discovery was ordered to be completed by August 1, 1990, and trial was continued until September 1990.
By letter of July 25, 1990, plaintiff's attorney notified defendant of her intention to use a vocational expert at trial. On or about October 8, 1990, plaintiff formally moved to be allowed to use the expert testimony of the vocational expert, an economist, and plaintiff's new treating physician who replaced her retired doctor. In support of this motion, plaintiff's attorney certified that after joining the law firm in February 1990, she became aware of the need for expert testimony to confirm plaintiff's wage loss.
The assignment judge heard oral argument on the motion on November 2, 1990. The defense argued that new issues were being injected into the case and that plaintiff had not yet produced all of her medical records. The judge granted the motion because he found no prejudice to the defendant as no new trial date had been set and there was no surprise or design to mislead.
Rule 4:17-7 provides that if a party who has furnished answers to interrogatories obtains information that renders such answers incomplete or inaccurate, amended answers "shall be served not later than 20 days prior to the first date fixed for trial." "Thereafter amendments may be allowed only for extraordinary or compelling reasons and to prevent manifest injustice ...," but in no case shall amendments be allowed where the evidence sought to be introduced was known more than ten days prior to trial. Ibid. Where a party seeks to introduce the testimony of a witness whose name was not supplied in answers to interrogatories, the exclusionary aspect of R. 4:17-7 may be relaxed in the interests of justice. See Feiler v. New Jersey Dental Ass'n, 199 N.J. Super. 363, 366, 489 A.2d 1161 (App.Div.), certif. denied, 99 N.J. 162, 491 A.2d 673 (1984). Factors to be considered in relieving a party of the imposition of the sanction of exclusion would be the absence of a design to mislead or conceal, the absence of an element of surprise, and the absence of prejudice. Westphal v. Guarino, 163 N.J. Super. 139, 145-46, 394 A.2d 377 (App.Div.), aff'd o.b., 78 N.J. 308, 394 A.2d 354 (1978); Brown v. Mortimer, 100 N.J. Super. 395, *14 402, 242 A.2d 36 (App.Div. 1968); Branch v. Emery Transp. Co., 53 N.J. Super. 367, 375-76, 147 A.2d 556 (App.Div. 1958).
We do not accept as valid defendant's claims of severe prejudice by not being supplied with the names and reports of these three damages experts prior to the liability trial. The use of these experts may, as defendant asserts, have "changed the complexion of the case," but defendant had no right to rely, prior to commencing the liability trial, on plaintiff's not having an actuary/economist or new treating physician at a subsequent trial on damages.
Further, even after receiving notice of plaintiff's new experts, defendant chose not to present its own damages expert. Rather, its strategy was to persuade the jury that plaintiff's case was not credible and that she had suffered only a minor injury. Defendant had ample time to counter these experts.
Defendant also argues that the court erred in denying its motion for a new trial on damages because the verdict of $908,000 constituted a miscarriage of justice, was against the weight of the evidence, and was the result of passion, prejudice, sympathy, or mistake. We disagree.
A trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities as to shock the conscience and to convince the judge that to sustain the award would be manifestly unjust. Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971). In making this determination, the judge must accept the medical evidence in the light most favorable to the plaintiff, and must presume that the jury believed the plaintiff's claims and the testimony of her supporting witnesses. Ibid.; McDonough v. Jorda, 214 N.J. Super. 338, 348, 519 A.2d 874 (App.Div. 1986), certif. denied, 110 N.J. 302, 540 A.2d 1282 (1988), cert. denied sub nom., Jorda v. City of New Brunswick, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). Thus, the jury's verdict should not be overturned except upon a carefully reasoned and factually supported and articulated determination that entry *15 of the judgment would constitute a manifest denial of justice. Baxter v. Fairmont Food Co., 74 N.J. 588, 597, 379 A.2d 225 (1977).
In denying defendant's motion, the judge observed that the issues of plaintiff's injury and economic loss were essentially credibility and demeanor determinations, which were within the jury's domain. He pointed out that plaintiff's symptomatology from the day following the accident to the date of trial eight years later never changed, and that her treating physician's clinical opinion never varied. Thus, the jury could properly have found a permanent injury. The judge concluded that he could not say that the verdict constituted a manifest denial of justice.
The measure of damages is an amount that reasonable persons would estimate to be fair compensation. Reasonable compensation includes bodily injuries, pain and suffering (past, present, and future), permanent disability, past and future medical expenses, and all other pecuniary losses suffered or to be suffered as the result of the injured party's inability to engage in one's usual occupation and activities. Amaru v. Stratton, 209 N.J. Super. 1, 21, 506 A.2d 1225 (App.Div. 1985). These losses were well documented by plaintiff and her experts. The jury award cannot be gauged by the "label" defendant chose to put on plaintiff's condition. Defendant's argument that a "low back sprain" is not worth $908,000 not only misstates the issue, it also is an inappropriate test of excessiveness because it ignores the principle that consequential damages in personal injury cases are not gauged by any established predetermined scale. The trial judge correctly charged the jury on the elements of damages demonstrated by plaintiff and her experts to be implicated by reason of her substantial permanent injury and disability. Further, plaintiff's medical proofs were capable of supporting a jury finding that her back injury was one involving the spine and intervertebral discs and not merely a low back sprain.
Defendant also maintains that plaintiff's economic expert was erroneously allowed to give a net opinion which simply *16 articulated a bottom line figure for plaintiff's future lost wages. Defendant bases this argument in part on the witness's use of a net interest rate figure. As explained earlier, the expert had informed the jury that, in calculating future lost wages, it should account for two opposing trends  inflation and other growth factors, versus the discounting factor or effect of investing a present sum of money at a certain rate of interest so as to produce a larger sum at a future time. He asserted that experience showed that the difference between these two rates usually hovers at between one and three percent. He, therefore, recommended the use of a two percent interest rate by the jury as reasonable.
Defense counsel, on cross-examination, tried without success to get the witness to indicate what rate of inflation and what rate of interest he had used for each particular year. The expert said it did not matter what these rates were because his analysis, which he maintained was generally accepted in the field of actuarial economics, was premised on the differential between these two rates and that this differential generally stays constant. Defense counsel also was unable to get the witness to say what amount of money plaintiff would be earning at any specific date in the future. The witness explained that his analysis did not provide for such an extrapolation. Rather, he used the net interest rate, in conjunction with the published tables, to arrive at a "factor." This factor was then multiplied by the current difference between plaintiff's actual earnings and what she would have been earning as a pediatric nurse.
We conclude that defense counsel's motion to strike the expert's testimony on the ground that his opinion had made no valid assumption as to the rates of interest and inflation in future years was properly denied. We find it noteworthy that in the trial judge's charge to the jury on future lost wages, he instructed the jury to account for inflation and present value in almost the identical manner as had the expert witness. The court told the jury to decide on the differential between the average rate of inflation and the projected interest rate so as to get an "effective *17 interest rate." The court also handed out tables to the jury which it told the jury it was not required to use. We are satisfied that the expert's method of calculation, even though based on standard assumptions, was not a ground for invalidating his testimony. Any shortcoming in his method of analysis was explored and it was for the jury to determine the weight his opinion should receive.
Defendant also contends that the economic witness was allowed to violate the holding of Tenore v. Nu Car Carriers, Inc., 67 N.J. 466, 341 A.2d 613 (1975) by presenting a bottom line figure to the jury on projected lost wages. This second basis for challenging the expert's testimony was not raised at trial. Defendant has failed to show on appeal that the alleged error could have led the jury to a result it would not have otherwise reached. R. 2:10-2; cf. Dunn v. Praiss, 256 N.J. Super. 180, 606 A.2d 862 (App.Div.), certif. denied, 130 N.J. 20, 611 A.2d 657 (1992).
Defendant also argues that the trial judge erred in allowing plaintiff's treating physician to testify that the MRI showed a herniated disc because this opinion was based on the treating physician's hearsay conversations with another doctor. We are unable to confirm that an objection was made at trial to this testimony. The trial judge's statement during argument on the motion for a new trial that defendant had objected to this portion of the doctor's testimony is not supported by the transcripts.
In any event, the doctor's opinion that the MRI showed that one of plaintiff's discs went down into the body of the next disc was properly presented to the jury even though the doctor came to this understanding after she had reviewed plaintiff's case and discussed it with a radiologist at Bryn Mawr Hospital. There was no error even if the doctor's opinion was thereby bolstered in the view of the jury by indirect or hearsay testimony. According to Evid.R. 56(2), the facts or data upon which an expert witness bases an opinion may be those perceived by or made known to the expert by others, provided it is "of a type reasonably relied upon *18 by experts in the particular field in forming opinions or inferences upon the subject...." Evid.R. 56(2).
The intent of the rule is to permit an expert opinion to be corroborated, confirmed, or bolstered by hearsay, but not to rely exclusively or primarily on it. Dietzeman v. Peterson, 196 N.J. Super. 96, 101, 481 A.2d 596 (Law Div. 1984); cf. Hartman v. Yawger, 212 N.J. Super. 187, 194, 514 A.2d 545 (Law Div. 1986) (holding expert testimony cannot render an opinion on the ultimate issue in the case by merely reciting the opinion of an out-of-court expert). This evidence rule recognizes that "in all scientific inquiry it is common for one expert to premise an opinion on those of `fellow technicians in related or cognate fields of science.'" Biunno, Current N.J. Rules of Evidence, comment 7 on Evid. R.. 56(2) (1993) (quoting Lewis Tyree, "The Opinion Rule," 10 Rutgers L.Rev. 601, 611 (1956)).
Defendant's contentions that the court erred in allowing plaintiff's economic expert to testify concerning the value of plaintiff's loss of household services because such damages were speculative is not supported by the record. Plaintiff did relate to the jury that she could no longer shop for herself, do laundry, cook, or clean. These services were being provided to her by her elderly parents. The court refused to allow the jury to hear any evidence regarding past loss of household services, as plaintiff had not yet expended any money for such services. However, her future loss was a proper item for jury consideration since there was a reasonable probability that, in the future, she would be unable to obtain such services without having to purchase them in the marketplace.
Plaintiff, in her separate appeal, maintains that the trial judge erred in tolling the running of prejudgment interest for a period of seventeen months. She claims that defendant's motion to stay the interest constituted an effort to retroactively limit the amount of damages, that the motion was untimely brought, and that this case was not an exceptional one as contemplated by court rules. We affirm on this issue substantially for the reasons expressed by the *19 Honorable John S. Holston, Jr. in his oral opinion from the bench of January 24, 1992, as corrected by his order of March 6, 1992. We find no abuse of discretion under R. 4:42-11(b).
Affirmed.