702 A.2d 1301

CHARLES MASON, JR., PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. SPORTSMAN'S PUB AND BOBBY LIEDTKA, DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 22, 1997—Decided November 19, 1997.

Before Judges SHEBELL, A.A. RODRÍGUEZ and COBURN.

*Edward B. Meredith* argued the cause for respondent/ cross-appellant (*Meredith, Meredith & Chase,* attorneys; *Mr. Meredith,* on the brief).

*Daniel S. Jahnsen* argued the cause for appellants/ cross-respondents (*Bolan Jahnsen,* attorneys; *Daniel S. Jahnsen,* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Defendants appeal and plaintiff cross-appeals. We affirm on all issues except the denial of plaintiff's motion to amend the judgment to include Sportsman's Pub (Pub). Accordingly, we remand for amendment of the judgment.

On May 14, 1991, plaintiff, Charles Mason, Jr., filed a complaint in the Law Division against the Pub, its owner, James S. Shaw, its "bouncer," Bobby Liedtka, and a number of fictitious defendants. Count One alleged negligence on the part of the Pub and referred to "unknown Corporations or persons" as owners and operators. Count Two alleged that Liedtka "negligently assaulted and beat" plaintiff and Count Three alleged that Liedtka intentionally committed a battery upon the plaintiff.

Plaintiff subsequently amended his complaint to assert in separate counts that Bob Seals "did negligently assault and beat" plaintiff, and did commit an intentional battery upon plaintiff. The complaint further alleged that the Pub, owned by Shaw, negligently continued to serve Seals despite knowledge that he was intoxicated and had a propensity for becoming violent when intoxicated.

The Pub, Shaw, and Liedtka filed answers through the firm of Parker, McCay & Criscuolo, P.A. Seals filed an answer and cross-claim for contribution through separate counsel.

Trial of the case was bifurcated. The liability trial took place from June 20 to June 26, 1995. At the conclusion of plaintiff's case, defense counsel moved for a directed verdict in favor of Shaw and the Pub. Plaintiff urged that there was a jury question as to the Pub's negligence in failing to provide a safe environment. The judge held there was no evidence from which the jury could

conclude that the Pub was negligent, and that jury questions existed solely as to the alleged intentional acts of Liedtka and Seals. Although the jury charge included instruction on whether Liedtka was acting within his scope of employment, no interrogatory regarding the vicarious liability of the Pub was given to the jury.

The jury, in responding to interrogatories, answered that Liedtka committed a battery and that Seals did not. It further reported that the battery was not committed in the exercise of self-defense and that plaintiff's physical conduct was not a proximate cause of his injuries. After the liability verdict was rendered in open court, the court clerk noted that the jury verdict sheet reflected an assessment of fault of 20% against plaintiff and 80% against Liedtka. The judge, therefore, instructed the jury to re-deliberate on the matter, directing the jury not to answer question number six on apportionment of fault unless it found in response to question five that plaintiff's physical actions were a proximate cause of his injuries. The original jury verdict sheet had erroneously instructed the jury to answer question six on apportionment of negligence even if it found plaintiff's physical actions were not a proximate cause of his injuries. After deliberation, the jury reported that plaintiff's physical actions were not a proximate cause of his injuries. The jury attributed fault only to Liedtka, and did not engage in apportioning fault.

On November 22, 1995, before the damages trial began, plaintiff moved to have judgment entered against Liedtka and the Pub jointly, severally, or in the alternative. The motion was opposed by the firm of Grossman & Kruttschnitt, who appeared as substitute counsel for the first time on behalf of the Pub and Shaw.

At this point we note that subsequent to the filing of the answer on behalf of the Pub, Liedtka, and Shaw, a reservation of rights letter purportedly was sent by the Licensed Beverage Insurance Exchange, the Pub's insurance carrier, to Liedtka stating he would not be covered if a verdict was entered against him based on his commission of an intentional tort. However, neither Liedt-

ka nor the Pub were provided with separate counsel. At the commencement of the liability trial, defense counsel told the jury in his opening statement that he represented

> the bar, the Sportsman's Pub.... [I]n addition to the Sportsman's Pub, I represent two of their employees.... Bobby Liedtka and ... James Shaw. Mr. Shaw is the manager of the bar at that time. Mr. Liedtka was security at the bar at that time. So, they're the people that I specifically represent in this case.

At the conclusion of the liability trial, confirmation of coverage by the Licensed Beverage Insurance Exchange extending to the three Pub-defendants was reaffirmed in the following exchange:

> You're Honor, it's my understanding that there, throughout the entire trial, full coverage, *full representation and full defense has been extended to Mr. Liedtka because of the nature of his position and the fact that he is an employee. I do not see any coverage issue or subsequent issue that could arise that*—
>
> The Court: Otherwise you would have had a conflict of interest, as I pointed out to you before the trial started; is that not correct?
>
> Counsel: I can't see how I would have represented Mr. Liedtka—
>
> The Court: You couldn't have.
>
> Counsel:—if they weren't going to cover him.
>
> The Court: Exactly. You couldn't have. That was the point that was made at the beginning of the trial.
>
> \* \* \* \*
>
> Counsel: [T]here are no coverage issues that I am aware of, and if I'm the attorney of record trying this case, I think I would know—I mean, I don't know everything in the world, that's why I'm saying—
>
> The Court: Mr. Borbi, I know you're not doing it intentionally, but you are sniveling, sir. Okay? Those are weasel words, "that I'm aware of." You would have a tremendous conflict of interest and Mr. Liedtka would have a tremendous malpractice suit if he were not covered, because you couldn't have represented him.
>
> Counsel: Correct. He would have been entitled to personal counsel.
>
> The Court: You couldn't have represented his interests—
>
> Counsel: That is correct.
>
> The Court:—when they're contrary to the Sportsman's Pub.
>
> Counsel: Absolutely.
>
> The Court: And so, *your representation is, in effect, provided through the carrier for both.*
>
> Counsel: *Yes, sir.*

[Emphasis Added.]

On January 11, 1996, the plaintiff moved for an order to correct the judgment so that the liability verdict against Liedtka would extend to the Pub based upon respondeat superior. The judge denied the motion.

The damages trial commenced on January 16, 1996. The jury found plaintiff's damages to be $264,750. On March 20, 1996, Liedtka's motion for a new trial was denied.

A Notice of Appeal was filed on May 31, 1996 by the Grossman firm on behalf of the Pub, Shaw, and Liedtka. A substitution of attorney was subsequently filed by the firm of Bolan Jahnsen asserting representation "for the defendants, Sportsmans [sic] Pub and Robert Liedka [sic]." The brief filed by Jahnsen similarly states it is on behalf of "Sportsman's Pub and Robert Liedtka."

On direct appeal, defendants make the following arguments:

Point I–The Court's Failure to Charge the Comparative Negligence of the Plaintiff Constituted Plain Error

Point II–The Trial Court Erred in Permitting Plaintiff's Expert, Lee Miller, M.D., to Issue Opinions for the First Time at Trial as to the Existence, Causation and Permanence of Plaintiff's Injury Where the Plaintiff Had Never Submitted a Report Prior to Trial

Plaintiff cross-appeals asserting: 1) the defendants are estopped to deny coverage; 2) the Pub is vicariously liable for the tort of its employee, Liedtka; and 3) the amount of the verdict was manifestly insufficient when measured against the damages visited upon the plaintiff.

## I

On the evening of August 11, 1990, plaintiff was a patron of the Sportsman's Pub in Trenton. An argument broke out between two female patrons, and Liedtka attempted to forcibly remove one of the women. Plaintiff commented to Liedtka: "That's no way to treat a lady, that's no guy." Liedtka told plaintiff to leave, and then removed plaintiff from the premises.

The testimony at trial conflicted as to the degree of force Liedtka used to remove plaintiff and whether or not plaintiff

initiated the confrontation by physically touching Liedtka. According to plaintiff, Liedtka turned after hearing his remark and said "Out now." Plaintiff responded "What did I do?" Liedtka responded by knocking a beer bottle out of plaintiff's hand and pushing him against the wall, repeating his order to get out. Plaintiff protested: "Wait a minute" and "Give me a chance." Plaintiff also stated he was struck twice by two unidentified men and then punched in the left cheek by Liedtka.

According to plaintiff, Liedtka placed him in a choke-hold and, with another individual, forced him to the door and threw him outside, causing plaintiff to miss the twelve-inch door step, fall, and strike his head on concrete. Plaintiff testified he was repeatedly hit in the head and twice kicked in the groin by unknown individuals. Finally, plaintiff was rolled off the step by someone's foot in order to close the door to the bar, and subsequently left the scene. Plaintiff denied using force of any kind except to try to get Liedtka's arm off of him so he could breathe when he was being held in the choke-hold.

James Gigglio, a person in plaintiff's group that night, testified that he witnessed plaintiff being held against the wall and that he did not see plaintiff punch or kick anyone. He denied seeing any altercation between plaintiff and Liedtka.

According to Liedtka, plaintiff grabbed him on the shoulder as he was trying to separate the two women and stated "That's no way to treat a lady." Liedtka responded "Mind your own business" and turned back to the women. He was then struck in the back of the head by the plaintiff. Liedtka turned and pinned the plaintiff to the wall, stating: "You're out of here." Liedtka held plaintiff against the wall until he was joined by another bouncer. He claimed plaintiff was trying to break free, and saying Liedtka had no reason to pin him against the wall. Liedtka and the other bouncer maneuvered plaintiff to the front door while plaintiff was kicking and fighting, attempting to break free. Liedtka denied striking plaintiff and that he saw anyone else hit him. He released plaintiff before the doorway and plaintiff walked outside,

but then turned and threatened Liedtka. Under cross-examination, Liedtka admitted he used a headlock on the plaintiff. He also asserted he had not been given any instructions or guidelines on how to carry out his job by the managers or owners of the Pub.

Christopher Koval, a friend of Liedtka's, testified that plaintiff struck Liedtka in the upper body or the back of the head as he was separating the women. He said Liedtka restrained plaintiff, but did not strike him. He did not witness any struggle on the part of plaintiff when Liedtka escorted him out. Koval recalled that a number of people were in the area of Liedtka and plaintiff during their altercation, and that some of these other people, in addition to Liedtka, were holding the plaintiff.

Liedtka's friend, Karl Bartkowski, who was a former bouncer at the Pub, testified that he saw plaintiff strike Liedtka on the side of the head as Liedtka was talking to the women. He did not see Liedtka strike plaintiff. According to Bartkowski, plaintiff was yelling and screaming "What's going on" and struggling to break free as Liedtka and another bouncer escorted him out of the bar. Further, Bartkowski claimed that, through the open door of the bar, he witnessed Seals throw a punch at the plaintiff. Another of Liedtka's friends, Robert Mitten, also testified he witnessed plaintiff strike Liedtka and that Liedtka did not strike the plaintiff.

Plaintiff's friend, Samuel Czaihowski, testified he did not see the plaintiff strike or even tap Liedtka. He saw Liedtka slap a beer mug out of the plaintiff's hand, pin him against the wall, and remove him from the bar. He also stated that three or four people, including Liedtka, were involved in pushing the plaintiff out of the bar. Plaintiff appeared hunched over as they removed him.

Seals denied he hit plaintiff at any time. The deposition of Brian Amison, the other bouncer present at the time, who was a friend of Liedtka, was read to the jury. He said neither Liedtka or he struck plaintiff, although plaintiff resisted being escorted out. He denied pushing or throwing the plaintiff out of the door, and asserted plaintiff did not trip or fall upon leaving.

Plaintiff testified that in 1977 he had sustained a skull fracture and hearing loss in his left ear, due to a motorcycle accident. He recalled recounting his complaints after that accident, including dizziness and loss of hearing, to Dr. Lee H. Miller. He said his dizziness cleared up several years after his motorcycle accident. Plaintiff stated that prior to the battery, he bowled frequently, played tennis, skied, and played pool. He recounted living with his mother from 1983 through 1990, and stated that he would cut the lawn, shovel snow, and clean the house.

Photographs of the plaintiff's injuries, taken the morning after the altercation, were admitted into evidence. His face appeared swollen, including his left cheek, ear, and lip. He had scratches and a dark circle under one of his eyes. He also testified he was bruised on his shoulder. The day after the incident, plaintiff went to an emergency room and complained of a headache, dizziness, a sore neck, and bruises on his right shoulder and the upper chest. The plaintiff, thereafter, was treated by several physicians. Plaintiff said at trial that he could no longer bowl, play tennis, or shoot pool due to spasms in his neck and dizziness. He wore an ear plug because of a steadily worsening buzzing sound in his ear. He could no longer work and considered himself permanently disabled due to his injury.

## II

■ We first consider the trial judge's refusal to exclude Dr. Miller's opinion that plaintiff's tinnitus and dizziness were related to the assault. The otolaryngologist testified by *de bene esse* videotaped deposition on January 12, 1996, four days before the liability trial began. Miller had treated plaintiff after the motorcycle accident in 1977, and also examined him for his current injuries.

Miller examined the plaintiff on September 25, 1990. His report, dated September 26, 1990, stated the following:

Charles presented to see me on 9/25/90. I have seen him once, about 12 to 13 years ago for a serious head injury which required about five or six months to

completely clear up. At that point in time he had vertigo, along with a hearing ·
loss. The old records have not been uncovered as of yet.

He now tells me he was beaten up about three weeks ago, sustaining a head injury
with decreased hearing in his left ear, vertigo and left sided tinnitus. I understand
he had a CAT scan which showed a concussion, but nothing else.

Exam today showed both drums and canals to be intact and normal. The nose and
throat were clear. An audiogram was performed and a copy is included. There is
a unilateral hearing loss in the left ear, mainly in the higher frequencies, but it is
quite asymmetric. A discrimination was 100% in the right, and 92% in the left.

In the absence of his old records I have to assume that some of this hearing loss is
of recent and due to his trauma of three weeks ago. He may need a MRI to rule
out the unlikely possibility of an acoustic neuroma, and I want to do my best to see
if we can find the old records for comparison studies. He is now taking Antivert
without significant improvement, and I have taken the liberty of switching him to
some Valium.

### Miller testified in his deposition:

I would conclude with a reasonable degree of medical certainty that the evolution
of the complaint of tinnitus would be new and as a direct result of the injury and
that the cochlea and vestibular portion of the inner ear, having been traumatized
previously, may have been in a susceptible state and therefore, the new and more
persistent symptoms of vertigo or dizziness would be related to the recent injury.

On cross-examination, the defense attempted to show that Miller
had no basis to conclude that plaintiff's ear condition was related
to the battery rather than the earlier motorcycle accident. The
following transpired:

[Defense counsel]: It is fair to say, though, that in terms of your response, you
seem to have indicated a need for information that you would have considered to be
important in evaluating the whole of your opinions concerning his hearing loss as it
exists in 1996 and its origins?

[Dr. Miller]: In order to conclude beyond any degree of unreliability or lack of
medical certainty, if I had annual follow-up audiograms, I could definitely correlate
the most recent injury with a new loss of hearing.

In the absence of that, I need to go on history and speculate. However,
speculation is not uncommon in situations such as this and in the absence of
additional complaints from the patient who had complained on not an irregular
basis prior to that and an absence of six years with no additional complaints, it
would be my feeling that his additional complaint of hearing loss is probably
reasonable.

[Defense counsel]: You don't know to what extent he—or his hearing had diminish-
ed at all after 1984 and up to August 1990?

[Dr. Miller]: That is correct.

At the damages trial, defense counsel objected that Dr. Miller's opinion, not being articulated in his original report or records, came as a surprise. The judge recognized that it might have surprised the defense, as there had been no previous record of the doctor's opinion as to permanency or causality. However, the judge recognized that if he struck the testimony the jury would only have the testimony of Dr. Mark Belafsky, defendant's otolaryngologist, who had testified out of turn, on January 18, 1996, before the jury viewed Dr. Miller's deposition.

Defense counsel responded that it had only used Belafsky to impeach the plaintiff's credibility regarding his complaints. It further argued that even though Belafsky had managed to offer a counter-opinion to Miller, the defense was still at a disadvantage due to its inability to conduct an adequate cross-examination of Miller during the videotaped deposition due to surprise.

Defendant relies on *Clark v. Fog Contracting Co.*, 125 *N.J.Super.* 159, 309 *A.*2d 617 (App.Div.1973) and *Westphal v. Guarino*, 163 *N.J.Super.* 139, 394 *A.*2d 377 (App.Div.), *aff'd o.b.*, 78 *N.J.* 308, 394 *A.*2d 354 (1978). In *Clark*, we affirmed the trial judge's ruling precluding plaintiff's expert from testifying on the ground that no report had been furnished to the defense. *Id.* at 161, 309 *A.*2d 617. We stated:

> The exclusion of testimony on the ground of failure to supply information sought in discovery is a discretionary matter for the trial court, bearing in mind the overriding objective of permitting the defaulting party his day in court. In this instance there was no reasonably available opportunity to permit plaintiff to remedy his default. The trial was already in progress and no forewarning of the expert's testimony had been given defendant. Under these circumstances we cannot say that the action of the trial court amounted to a clear abuse of discretion.
>
> [*Id.* at 162, 309 *A.*2d 617 (citation omitted).]

In *Westphal*, the trial judge barred the testimony of two expert witnesses whose names were submitted out of time. *Westphal, supra*, 163 *N.J.Super.* at 143, 145, 394 *A.*2d 377. On appeal, we noted that "the application of the sanction [of exclusion] is consigned to the sound discretion of the judge, subject only to the rule that the sanction visited upon the party must be just and reasonable." *Id.* at 145–46, 394 *A.*2d 377. We pointed to three

factors which would "strongly urge" the trial judge, in the exercise of his discretion, to suspend the imposition of sanctions: ... (1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence.

[*Id.* at 146, 394 *A.*2d 377.]

We reversed the exclusion of the experts, finding an abuse of discretion. *Id.* at 148, 394 *A.*2d 377.

Here, we first note the absence of any allegation that the plaintiff sought to mislead the defense. Regarding the claim of surprise, Dr. Miller's initial report did state: "In the absence of his old records I have to assume that some of this hearing loss is of recent and due to his trauma of three weeks ago." The defense, therefore, should have been prepared, as indeed it was, to respond effectively to Miller's testimony through the testimony of its defense expert, Belafsky. We see no basis for the defense's claim that it was unfairly punished simply because its medical expert managed to refute Miller's testimony or that it did not intend to refute Miller's testimony through Belafsky, but only to impeach the credibility of the plaintiff and his complaints.

Unquestionably, it would have worked substantial unfairness on the plaintiff to have Belafsky's testimony admitted unanswered. In addition, we find little prejudice to defendants. Belafsky's testimony clearly concerned the issues that Miller testified to, as demonstrated by the following transcript excerpt:

Q: All right. Have you had the opportunity to review hearing tests that were conducted subsequent to the 1990 trauma?

[Dr. Belafsky]: Yes.

Q: Do those hearing tests in any way differ, from the hearing tests performed before 1990?

[Dr. Belafsky]: Hardly at all.

Q: ... In reviewing the records that were supplied in examining Mr. Mason ... have you arrived at any conclusions that the tinnitus if any, dizziness if any, or hearing loss if any, sustained by—or suffered by Mr. Mason, were attributable to any other origin, besides the 1977 motor vehicle incident?

[Dr. Belafsky]: The[y] were not.

Q: ... [D]o you have an opinion within a reasonable degree of medical probability, as to whether any of his complaints were at all attributable to trauma sustained in 1990?

[Dr. Belafsky]: Well, the—we have no way of measuring tinnitus. Ringing in the ears. We have to rely on the patients telling us that. So there's no way I can objectively measure ringing in the ear.

I—to be—it's my opinion beyond a reasonable degree of medical certainty, that there was no further damage to his hearing, as a result of the—accident in 1990, nor was there any damage to his dizzy centers.

Q: Okay. Now, getting back to the tinnitus, and we'll discuss that just briefly. You indicated that with regard to the nerve damage, that would have occurred in 1977, and tinnitus is a likely symptom, from such damage?

[Dr. Belafsky]: Yes.

Q: All right. During the course of your evaluation of the records, and in conducting the examination of Mr. Mason, in 1995, did you discover or unearth any physical component, related to the trauma in 1990, which could cause the symptom of tinnitus?

[Dr. Belafsky]: No.

We find no abuse of discretion in the trial judge's ruling. Any surprise to the defense was rendered non-prejudicial by Belafsky's testimony. We do not see that the trial would have played out any differently if Miller's report had put defendants on more particular notice of his final opinion.

## III

Defendants argue that the instructions of the trial judge constituted plain error in failure to charge the jury with comparative fault in this context and limiting the type of fault which could be assessed against the plaintiff only to physically initiating an altercation with Mr. Liedtka. Specifically, reviewing the jury interrogatories in this matter, the plaintiff's verbal actions in connection with this incident could not even be considered by the jury in apportioning fault.

■ Because defendants failed to object to the charge, any error must rise to plain error. *R.* 2:10–2. The standard of review is set forth by *R.* 2:10–2:

Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.

In considering a jury charge, plain error is legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.

[*State v. Hock*, 54 *N.J.* 526, 538, 257 *A.2d* 699 (1969), *cert. den.*, 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.2d* 797 (1970).]

The trial judge instructed the jury with regard to comparative fault as follows:

[I]n cases where you have two defendants and a plaintiff, and all are alleged to be at fault; the plaintiff alleges that the defendant, Liedtka, was at fault for his injuries. Defendant, Liedtka, alleges that Seals was at fault, and, likewise, asserts that he was defending himself against a perceived assault by the plaintiff. You have to evaluate. If you find more than one party was at fault and proximately caused the plaintiff's injuries, then you have to compare the conduct of those parties in terms of percentages. You will attribute to each of them that percentage which you find describes or measures the contribution to the happening of the incident. The percentages must add up to 100 percent. And this, of course, would only come into play if you find more than one at fault.

You should not allocate any percentage to any party who you have found was not at fault for the plaintiff's injuries. In other words, if he contributed to his own injuries, then you can attribute a per—or allocate a percentage to him. But the effect of your allocation of percentages has to be explained. In order for the plaintiff to recover against the defendant, the plaintiff's percentage of conduct must be 50 percent or less. If the plaintiff's percentage is more than 50 percent, he will not recover damages at all, and your deliberations would be concluded. You should not make any determination as to any damages, but I'm explaining to you the consequence of your percentage allocation.

A plaintiff whose percentage is 50 percent or less will recover from any defendant whose negligent con—or strike negligent—whose conduct was a proximate cause of the incident. The allocation you make among the defendants will determine how much of the plaintiff's, ultimately, damages that they would pay.

Jury interrogatory number five posed the following question: "Do you find that the plaintiff's physical actions (more than mere words) were a proximate cause of his injuries."

■ As to words, plaintiff was alleged to have made the following remarks: "That's no way to treat a lady, that's no guy," "Wait a minute," "What did I do," and "Give me a chance." Such remarks could not in this context be reasonably construed by a jury to have precipitated the battery or been a proximate cause of the plaintiff's injuries. Thus, the jury was appropriately directed not to consider the plaintiff's "mere words" as a basis for attributing fault to the parties. Moreover, it is clear that the thrust of the defense was that the plaintiff initiated the altercation between Liedtka and himself by physically striking Liedtka in the back of the head, not by his choice of words. However, Liedtka testified

only that plaintiff was physically attempting to break free while simultaneously saying that Liedtka had no reason to pin him against the wall. On these facts, the judge correctly instructed the jury to consider only the physical actions of the plaintiff. We reject defendants' assertion of plain error.

## IV

Plaintiff cross-appeals and argues that, due to defense counsel's representations at trial that no coverage issue existed and that Liedtka was covered, the Licensed Beverage Insurance Exchange is estopped to deny coverage. We do not consider this an appropriate issue for review in the present appeal, as the insurance carrier is not a party to these proceedings. We are advised that this issue is the subject of a separate action seeking to establish coverage. We add that the issue may be moot in light of our holdings in parts V and VI, below.

## V

We agree with plaintiff's assertion that the Pub is vicariously liable for Liedtka's battery of plaintiff. It was error for the trial judge to refuse to amend the judgment to reflect the Pub's liability.

Concerning an employer's responsibility for the intentional torts of their employees, the court instructed the jury as follows:

Now, Mr. Liedtka was in—there's some testimony, there is testimony in this case that Mr. Liedtka was in the performance of his duties as a bouncer. He was a door checker and had worked in the Sportsman's Pub, and, generally, employer is only liable for acts of its employees committed while acting in the scope of their employment. Absent an express or implied authorization of an employee to use force, the employer is not responsible for any intentional assault outside the employee's scope of employment.

In determining whether an employee acted outside the scope of his employment, you should consider whether the employee was furthering the interest of his employer, whether the employer was able to exercise control over the employee's actions, and whether the employee's actions were or were not performed for the benefit of the employer.

Although the jury was instructed on how to make specific findings in determining whether Liedtka's actions were performed in the course of his employment, the court did not submit to the jury any interrogatory for them to answer. Although plaintiff's counsel failed to object to the absence of an interrogatory on the issue, he moved to "correct the verdict" before the damages trial began.

Defendants take the following position: "In this matter a question of fact existed for the jury's resolution which was never presented to the jury. Accordingly, on the retrial, the matter should be given to the jury in the form of a jury interrogatory so that they may decide this matter." We disagree, as we are convinced that no factual dispute remains.

In *Roth v. First National State Bank of New Jersey*, 169 *N.J.Super.* 280, 404 *A.*2d 1182 (App.Div.), *certif. denied*, 81 *N.J.* 338, 407 *A.*2d 1212 (1979), we looked to the Restatement of Agency for a test to determine whether under all of the circumstances the conduct of the servant was within the scope of employment. *Id.* at 285, 404 *A.*2d 1182. The Restatement places the conduct of the servant within the scope of employment, only if:

a) it is of the kind he is employed to perform;

b) it occurs substantially within the authorized time and space limits;

c) it is actuated, at least in part, by a purpose to serve the master, and

d) if the force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

[*Restatement (Second) of Agency*, § 228(1) (1958).]

Subsection (2) of Section 228 further provides:

Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

[*Id.* § 228(2).]

It is patently clear that the exclusionary language of subsection (2) does not apply to the present facts. We, therefore, look to the four part test of subsection (1) to determine whether an affirmative finding of inclusion within the scope of employment can be found as a matter of law.

First, it is not disputed that Liedtka was employed to perform the duties of a bouncer. Although Liedtka was not instructed with respect carrying out those duties, it has not been argued in this litigation that seeking to quiet unruly patrons, and ejecting them when considered necessary, are not the kinds of activities he was hired to perform. Second, the occurrence unquestionably took place during the hours that Liedtka was employed and within the space limits of his employment. Third, there has been no attempt to dispute that Liedtka's purpose in acting to quiet the disturbance and to eject the patrons, including plaintiff, was to serve the purpose of his employer in maintaining an orderly establishment.

Lastly, assuming for the purposes of the application of the fourth prong of the Restatement test, Section 228(1)(d), that the force used by Liedtka was intentionally used against plaintiff, we hold that the extent of force used by Liedtka in his capacity as a bouncer is not "unexpectable" by the operator of the Pub as described at trial. The comment to Section 228(1)(d) of *Restatement* 2d of Agency provides:

> The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury.

> [*Restatement (Second) of Agency*, § 228(1)(d) cmt.d (1958).]

In these circumstances, the force used cannot be considered so unusual or exceptional as to be "unexpectable" from one acting as a bouncer in such a setting. In *Ash v. 627 Bar, Inc.*, 197 *Pa.Super.* 39, 176 *A.*2d 137 (1961), a bartender was held to be acting within the scope of his employment when he battered a patron, rendering him unconscious, because he did not pay for his drinks. The court reasoned:

> They [the actions of the bartender] were not "shocking and a gross abuse of authority," nor were they "so excessive and dangerous, totally without responsibility or reason," as where a patron shoots a patron annoying a female. They were, in fact, fairly adapted to accomplish the purpose of the employment, ... There were no weapons involved in the case at bar and the bartender was not acting toward an interest antagonistic to the defendant.

[*Ash, supra,* 176 *A.*2d at 140 (quoting *Howard v. Zaney Bar,* 369 *Pa.* 155, 85 *A.*2d 401 (1952)).]

We add that as between the parties, it is "expedient as a matter of justice" to charge the Pub operator with liability for Liedtka's actions. *See Roth, supra,* 169 *N.J.Super.* at 287, 404 *A.*2d 1182 (citing *Prosser, Law of Torts,* at 460 (1971)).

We conclude that under these circumstances the trial judge was correct in not propounding a separate interrogatory to the jury concerning the liability of the Pub, but that he erred in not molding the verdict to impose liability on the Pub once the jury determined that Liedtka was liable and there was no fault on plaintiff's part. There were no facts in dispute which would negate or otherwise place in issue the imposition of liability based upon *respondeat superior* since, as a matter of law, Liedtka was acting within the scope of his employment.

## VI

Plaintiff seeks a new trial on damages alone based on his argument that the jury's award was manifestly insufficient. However, under *R.* 2:10–1, plaintiff's argument is not cognizable on appeal, as plaintiff failed to move for a new trial on the grounds that the jury award was against the weight of the evidence. In any event, we find no basis on which to conclude that the jury's verdict constitutes a manifest denial of justice. *Glowacki v. Underwood Memorial Hosp.,* 270 *N.J.Super.* 1, 14–15, 636 *A.*2d 527 (App.Div.1994). Substantial testimony was offered at trial refuting plaintiff's claims of permanent and total disability. The jury's award of $264,750 does not constitute a clear miscarriage of justice.

The judgment on appeal is affirmed. We remand on the cross-appeal for amendment of the judgment to impose liability against the Sportsman's Pub and Bobby Liedtka, jointly, severally, and in the alternative.

Affirmed in part; reversed and remanded in part.