823 A.2d 65 (2003)
360 N.J. Super. 337
Gail SMITH, Plaintiff-Respondent,
v.
Jacquelin SCHALK, Defendant-Appellant.
No. A-2895-01T3.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 2003.
Decided May 27, 2003.
*66 John G. Tinker, Jr., Cedar Knolls, argued the cause for appellant (Leary, Bride, Tinker & Moran, attorneys; Mr. Tinker, on the brief).
Robert M. Messina argued the cause for respondent (Nicholas A. Mattera, attorneys; Mr. Messina, on the brief).
Before Judges A.A. RODRÍGUEZ, WELLS and PAYNE.
The opinion of the court was delivered by WELLS, J.A.D.
Defendant, Jacquelin Schalk, appeals from the denial of her motion for a new trial following a judgment against her in the amount of $341,129 in favor of plaintiff, Gail Smith. Smith had filed suit against Schalk after an automobile collision on November 17, 1998, in which Smith alleged Schalk was negligent and proximately caused Smith to suffer personal injuries. Smith filed suit in December 1998.
Because the dispositive point on appeal in this case involves the trial judge's decision to permit Smith to admit certain medical information emerging on the eve of trial, we need only outline the state of that information as it developed between the accident and the start of trial on October 16, 2001.
In January 1999, about two months after the accident, Smith had MRI examinations of her neck and low back. The significant findings as to her neck were:
No degenerative disc space narrowing was seen.
There was no herniated nucleus pulposus (HNP) or focal posterior bulging of the annuli at any level.

*67 There was no central canal stenosis, lateral recess stenosis or foraminal stenosis. Signal within the cervical spinal cord itself was unremarkable. The marrow elements showed no evidence of occult fracture or edema. There was no cerebellar tonsillar ectopia. The pre-vertebral soft tissues appeared unremarkable.
Impression No herniated disc.
Those for her low back were:
A rudimentary S1-2 disc space was present, possibly due to a partly transitional S1 segment. For purposes of this report, the lowest fully formed disc space was referred to as L5-S1.
The thecal sac capacious. There was no spinal stenosis. No degenerative disc space narrowing was seen. There was no foraminal stenosis. The facet articulations were intact, with a mild amount of hypertrophy at L4-5 and L5-S1.
At L5-S1, there was posterior bulging of the annulus fibrosis with impression upon the spinal canal, more just to the left of the midline.
Impression Bulging annulus at L5-S1.
We note that Smith treated for her injuries until September 1999, and all the other medical examinations, conducted by both Smith's physicians and a defense physician, rested upon the January 1999 MRI results; clinical examinations; Smith's medical history; and the history of the accident itself.
The case was listed for trial for the first time in April 2000. Smith's medical examination with Dr. Orlando Ricciardello, the defense physician, was also conducted in that month. The trial was not reached in April or on two more listings in 2000. It was not listed again until May 2001, at which point, counsel exchanged pretrial information, each listing their respective proposed witnesses. Schalk's pretrial memo noted an anticipated "motion to limit testimony >by plaintiff and plaintiff's medical experts to symptoms and complaints listed in answers to interrogatories and medical reports." The trial was again not reached, and on June 1, 2001, the matter was listed for September 17, 2001.
On August 15, 2001, Smith presented for the first time to Dr. Mary Swajian, who examined her then and again on August 22, 2001 and ordered new MRIs. Dr Swajian rendered a report on August 22, 2001, which was served on counsel on September 12, 2001 by letter, and also stated that Smith's interrogatory answers were being amended to include the new information. The reports of the new MRIs, performed on September 10, 2001, were served on counsel on September 14, 2001 under cover of a letter indicating that Smith intended to introduce those results at trial.
The September 10, 2001 MRI of the cervical spine revealed the following:
At C5-6 and C6-7, there was anterior bulging of the annulus fibrosis. There was also posterior bulging of the annulus fibrosis at C5-6 adjacent to the anterior subarachnoid space.
The disc material did not extend beyond the annulus margins; there was no herniated nucleus pulposus at any level.
The marrow showed no occult edema. The prevertebral soft tissues showed no edema. The signal in the cervical spinal cord itself was unremarkable. There was no cerebellar tonsillar ectopia. There was no degenerative disc space narrowing.
Impression Bulging annuli at C5-6 and C6-7.
The MRI of the lumbar spine taken on September 10, 2001 revealed the following results:

*68 A transitional S1 segment is present with a rudimentary S1-2 disc space. For the purpose of this report, the lowest fully formed disc space referred to is L5-S1.
At L5-S1, there was posterior bulging of the annulus fibrosis adjacent to the anterior epidural fat ventral to the thecal sac at midline and slightly to the left of midline. The disc material did not extend beyond the annulus margins; there was no herniated nucleus pulposus at any level.
There was no degenerative disc space narrowing. There was no spinal stenosis. Facet articulations were intact. The surrounding soft tissues appeared unremarkable. There was a trace amount of facet hypertrophy at L4-5 and L5-S1.
Impression Bulging annulus at L5-S1.
The parties appeared on the trial date scheduled for September 17, 2001, and settlement discussions began in earnest. The trial was continued to October 15, 2001. On September 18, 2001, Smith's counsel wrote a letter to Schalk's counsel which stated in part:
I take the opportunity at this time to resubmit for your inspection and file an updated report from Mary Swajian, M.D. dated August 22, 2001, and a Narrative report from Magnetic [Resonance] of New Jersey, wherein Dr. Traflet indicates that in addition to a bulging annulus at L5-S1 there are trace amount Hypertrophy at L4-5 and L5-S1. It should also be noted that Dr. Swajian relates the bulging annuli at C5-C6 and C6-C7 to the trauma of the automobile accident, which is the subject matter of this lawsuit. As you are aware, the prior MRI films were negative for bulging annuli in the cervical spine, not withstanding the fact that x-rays taken on November 17, 199[8], the date of the accident, that there was a straightening of the normal [lordotic] curve of the cervical spine. It is our position that the documentation included herein and all additional findings of which should be taken into assessment with regard to your evaluation of this claim.
At the start of trial, Schalk objected to the Swajian report and the September MRIs. The judge inquired of plaintiff's counsel why Smith had not been examined until the last minute. Counsel explained:
Judge, the plaintiff was cut off from medical care byher carrier. All right? She thought she had reached maximum benefit. She realized that the condition in her neck was worsening. And incidentally, Dr. Huish found that there was left shoulder bicipital tendinitis. Dr. Huish also in an EMG found cervical myofascial pain syndrome, and that's an EMG, Your Honor.
Initially the plaintiff believed that the conditions would move on to a static state of resolution upon which she could tolerate the degradation of her daily activities as well as the pain being imposed. It got to a point where later this summer she found that the condition was becoming more and more of an intolerable situation. An appointment was then made with Dr. Swajian, that appointment was on the 15th. As soon as we got the report, Your Honor, we mailed that report out.
In turn, the judge inquired why no request for an adjournment had been made by the defense to permit it an opportunity to meet the new information. The following colloquy ensued:
THE COURT:if you have a trial between two parties and the problem is the trial date, *69 [DEFENSE COUNSEL]: Your Honor, not to put too fine a point on it, I have attended many calendar calls in this county where parties have asked for adjournments based upon late discovery or an opportunity to obtain subsequent reports. I can't say unanimously, but 95 percent of the time Judge Gallipoli's response was you will not get this, move at the trial level to bar the testimony. That's what I'm doing.
THE COURT: But you didn't do it in this case?
[DEFENSE COUNSEL]: I don't understand, Judge.
THE COURT: You didn't ask him in this case for an adjournment?
[DEFENSE COUNSEL]: No, I did not.
THE COURT: The reason why I'm asking is, if the only thing that's going to go before the jury is something that's two years old, and if the object is to try to ascertain what happened, the truth of the claims, plaintiff claiming that they're true, defendant claiming that they're not entirely true.
[DEFENSE COUNSEL]: Um-hum?
THE COURT: Wouldn't a current evaluation be the most rational way of ascertaining the truth?
Following an additional exchange between the court and counsel, the judge ruled:
All right. Counsel, I'm going to allow it in, I don't see any real prejudice. There's no real surprise here, you can cross examine the doctor, you'll see thegive him the report now. I don't know if you can have it today or tomorrow, and the report will go in, thethe testimony will go in, not the report.
The trial proceeded. At some point, the judge offered Schalk an opportunity to take an overnight deposition of Dr. Swajian, an offer the defense declined. The trial concluded with the jury's verdict of $300,000 in favor of Smith for pain and suffering and $2,400 in lost wages. The judge entered judgment on October 31, 2001, which included prejudgment interest, for a total award of $341,129.
Schalk moved for a new trial or a remittitur. Suffice it to say, the judge found no basis to disturb the jury's award or to conclude that there had been a miscarriage of justice. In a letter opinion dated January 8, 2002, the judge reviewed his decision to permit Dr. Swajian's testimony. He said:
The testimony of both doctors was reasonably related to their extensive reports. The main thrust of defense objection was to any testimony by Dr. Swajian. Her report was delivered 30 days before trial. No motion was made to limit her; no motion was made for an adjournment; counsel was given the opportunity to depose her before she testified but the opportunity was waived. Thirty days was enough time for defendant to proffer its expert if it moves to do so; the trial court invited counsel to seek an adjournment from the Presiding Judge, (no application having been made to the Trial Judge). The offer was refused. The thrust of defendant was not to have a balanced playing fieldbut to stop plaintiff from having his player on the field at all.
An examination of the transcript of colloquy with counsel at trial and on the motion should establish that the object of the rulings was to see that all relevant evidence would be available to both parties on a fair basis.
Much of Judge Pressler's commentary on pages 1324 and 1325 (Rule 4:17-7[2]), particularly section 2 "experts" *70 and particularly the Westphal case are supportive of the court's position.[1]
The circumstances concerning the submission of the Swajian report are set forth in a cover letter sent to defense counsel on September 18. There is no intent to abuse the rules. There was no surprise at trial. Any "prejudice" resulted from defendant's failure to even try to meet the issue.
Of the three points raised in Schalk's appellate brief, two of them deal with the judge's decision to admit Swajian's testimony and the results of the September 2001 MRIs. While there was no extensive argument about the applicable rule of court during the colloquy before the trial judge, and he mentioned it only in passing in his ruling on the motion for a new trial, there is no doubt that the applicable rule is Rule 4:17-7.
In September and October 2001, that rule provided:
Except as otherwise provided by R. 4:17-4(e), if a party who has furnished answers to interrogatories thereafter obtains information that renders such answers incomplete or inaccurate, amended answers shall be served not later than 20 days prior to the end of the discovery period, as fixed by the track assignment or subsequent order. Thereafter amendments may be allowed only if the party seeking to amend certifies therein that the information requiring the amendment was not reasonably available or discoverable by the exercise of due diligence prior to the discovery end date.
At that time, the rule had been in effect for one year. It was adopted in September 2000 as part of a general revision of the rules known as "Best Practices." While an argument has been made that the Best Practices rule amendments do not apply to cases filed, as this one was, prior to September 5, 2000, we conclude otherwise. The Law Division has recently held that the rule applied to bar late blooming defense bio-medical evidence in a case filed prior to September 5, 2000. See Montiel, supra, 347 N.J.Super. at 250, 789 A.2d 190. Speaking specifically about Rule 4:17-7, Judge Todd said:
The amended rule clearly applies to this dispute. The September 2000 amendment to Rule 4:17-7 is not limited to cases filed after September 2000. Compare R. 4:24-1(d).
[Ibid.]
A reading of Rule 4:24-1(d) clearly suggests that in the absence of a provision such as (d), saving certain discovery time limits under the prior rules, the "Best Practices" rule amendments, as in the case of other rule amendments, were effective on September 5, 2000 for all cases regardless of when filed. Such changes are a part of an annual ritual of rule amendments that the Supreme Court approves in the summer for publication in September and which are effective at once for all pending cases. We discern no reason to accord a case filed prior to September 5, 2000 exemption from the current provisions of Rule 4:17-7, a full year after its effective date, absent a specific provision saving the pre-2000 terms of the rule.
*71 In this case, Smith failed to file an application to amend her interrogatories supported by an affidavit that due diligence would not have produced a much earlier medical re-examination, tests and reports. Instead of requiring such a submission or suppressing the evidence, the judge turned to methods commonly employed under the pre 2000 rule to ameliorate the prejudice incident to his decision to admit the late blooming evidence. But it is those methods that increase expense, expose the trial to delay, open the door to gamesmanship in the trial of cases, and defeat one objective of "Best Practices" to promote trial-date certainty.
Schalk, through no fault of her own and in the face of a complete absence of any showing of due diligence by Smith, was suddenly put on the defensive for not requesting an adjournment; seeking a new defense medical exam; and declining to engage in an overnight deposition. It is true that some time became available between September 17 and October 15 to meet Smith's evidence. Schalk insisted it was not enough time. But the point is that this case should have been fully trial-ready when it was listed in May 2001, then its fourth listing. If parties must use last minute continuances to level a precipitously upset playing field, then gamesmanship has truly re-emerged in the trial of cases to the detriment of the litigants and the public.
Here, the new medical evidence was not served until five and three days, respectively, before the scheduled trial on September 17, 2001. We are satisfied that the new evidence, adding objective evidence of injury to Smith's neck related to the accident and to her claim of permanency, had the clear capacity to influence the jury. That, per se, prejudiced Schalk and contributed to a miscarriage of justice. At the very least, emergence of the new evidence on the eve of trial demonstrated a lack of due diligence, its admission into evidence failed to enforce Rule 4:17-7 without justification, and its consideration unfairly prejudiced Schalk's case in defense. The judge erroneously concluded that there was minimal prejudice or surprise to Schalk and, without requiring Smith to make a showing that due diligence would not have revealed the new evidence earlier, improperly shifted the burden to Schalk to meet the evidence. We are, therefore, constrained to reverse and remand for a new trial.
We have reviewed Schalk's remaining argument that she was prejudiced by certain statements made by Smith's counsel in his closing to the jury. The issue was not raised either at the time of the closing itself or during the motion for a new trial. We decline to consider it now. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
Reversed and remanded for a new trial. Subject to a shortened discovery schedule that the Law Division shall establish, the new evidence may be considered for admission at the new trial.
NOTES
[1] Westphal v. Guarino, 163 N.J.Super. 139, 394 A.2d 377 (App.Div.), aff'd, 78 N.J. 308, 394 A.2d 354 (1978) and a great many other cases construed the pre-Best Practices provisions of Rule 4:17-7 and were generally liberal in permitting relaxation. In light of the changes effected by Best Practices, however, the Law Division has recently declined to follow that line of cases asserting that to do so would render Rule 4:17-7 "virtually meaningless." Montiel v. Ingersoll, 347 N.J.Super. 246, 255, 789 A.2d 190 (Law Div.2001). See generally Pressler, Current N.J. Court Rules, comment on R. 4:17-7 (2003) (discussing and citing cases relating to rule relaxation).