848 A.2d 73 (2004)
369 N.J. Super. 123
Charles ZADIGAN, Plaintiff,
v.
Leonard COLE, D.D.S., and Margaret Somers, D.M.D., Defendants.
Superior Court of New Jersey, Law Division, Bergen County.
Decided January 22, 2004.
*74 Donald A. Caminiti, Hackensack, for plaintiff (Law Offices of Breslin and Breslin, P.A., attorneys).
David Lustbader, Livingston, for defendant Leonard Cole, D.D.S.
Christopher Hirsch, for defendant Margaret Somers, D.M.D (Hardin, Kundla, McKeon, Poletto & Polifroni, P.C., attorneys, Springfield).
WALSH, J.S.C.
This matter is before the Court on a motion for reconsideration filed by the defendant Leonard Cole, D.D.S. ("Dr. Cole" or "defendant") to permit the late filing of an expert report by the defendant and the expert testimony of Dr. Ira Lamster ("Dr. Lamster") during trial.[1] For the reasons that follow the motion is denied.

I.
The plaintiff Charles Zadigan ("Zadigan") alleges that at some time during the course of his treatment with Dr. Cole, from 1977 through 1999, he developed severe periodontal disease. He claims that Dr. Cole and Margaret Somers, D.M.D. ("Dr. Somers") (collectively "defendants") were negligent in failing to timely diagnose and treat the disease, and thus are liable to him for dental negligence.
Zadigan's action began on February 7, 2001. The initial discovery end date was set for June 29, 2002, with a trial to follow on January 21, 2003. On June 6, 2002 Dr. Somers sought to extend the June 29, 2002 discovery end date. The motion judge granted that motion and extended the discovery time period for ninety days. The new discovery end date was September 29, 2002.
On August 28, 2002 a second request to extend discovery was sought by Dr. Cole. Again, the motion was granted and the discovery time period was extended to October 31, 2002. This time, the order also directed the defendants to file all expert liability reports on or before October 31, 2002.
On December 4, 2002 still another request to extend the discovery end date was filed. Again, on February 7, 2003, the motion judge granted the application and now required the submission of all expert reports by March 7, 2003. But the motion judge directed that the discovery extension was not to interfere with the then pending March 31, 2003 trial date.
On March 14, 2003, seven days after the March 7, 2003 discovery end date, Dr. Cole submitted the expert liability report of Dr. Lamster. Dr. Lamster's opinion raised issues not previously in the casei.e., there existed a potential link between the plaintiff's periodontal disease and a prior heart attack.
On March 17, 2003 Zadigan sought to bar the expert report of Dr. Lamster, relying on R. 4:17-4(e)[2] and R. 4:17-7,[3] and *75 noting both the imminent March 31, 2003 trial date and the indisputable fact that the March 7, 2003 discovery end date had passed. Plainly the application was appropriate since R. 4:24-1(c) provides that "[a]bsent exceptional circumstances, no extension of the discovery period may be permitted after an arbitration or trial date is fixed." Dr. Cole cross-moved to admit Dr. Lamster's report as timely.[4] As far as this Court can tell, no serious effort was made to justify the late filing of Dr. Lamster's report, let alone to provide the exceptional circumstances necessary to permit it. On April 4, 2003 the motion judge granted the motion to bar Dr. Lamster's expert report.
On April 22, 2003 Dr. Cole sought reconsideration of the motion judge's ruling. The application sought three different yet related forms of relief. First, Dr. Cole sought vacation of the motion judge's April 4, 2003 order. Second, Dr. Cole sought to bar the late filed expert reports of Drs. Montana and Philips by the plaintiff. Finally, Dr. Cole sought to depose Drs. Montana and Philips in the event that their expert reports were permitted. Zadigan opposed Dr. Cole's application, claiming that Dr. Lamster's report should be barred because it raised new issues after the close of discovery and therefore severely prejudiced him. Paradoxically, Zadigan argued that no such prejudice existed with Drs. Phillips and Montana's reports because they simply had the effect of increasing the amount of special damages sought. These reports, according to Zadigan, expressed no new opinions. The motion judge did not discuss R. 4:24-1(c). Instead, relying on Westphal v. Guarino, 163 N.J.Super. 139, 394 A.2d 377 (App.Div.1978),[5] the motion judge determined *76 that "no prejudice to plaintiff ... would result from the admission of ... [Dr. Lamster's] report." No explanation supporting this finding was presented in the decision or the record, so far as this Court can determine. The motion judge also concluded that "there was no design to mislead on behalf of [Dr. Cole or his attorney]." The motion judge deemed Dr. Lamster's report as timely nunc pro tunc and extended the discovery end date to June 22, 2003. Finally, the motion judgeagain with no apparent support deemed the reports of Drs. Philips and Montana timely. The motion judge was aware that a trial date then existed for June 23, 2003, and he directed that the discovery extension should not interfere with that trial date.
The motion judge's about-face caused the plaintiff to once again seek to bar the expert report and testimony of Dr. Lamster. Upon reconsideration, the motion judge returned to his initial position and barred Dr. Lamster's report and testimony. He now concluded "that Plaintiff would be subjected to prejudice by the introduction of ... [Dr. Lamster's] report," because the report presented "previously undisclosed medical theories," and counsel for the plaintiff would be "unable to obtain a cardiologist at this late date."
As the attorneys' maneuvering played out, the trial date was again adjournedthis time until September 29, 2003. On August 22, 2003, Dr. Cole sought permission to appeal the rulings of the motion judge to the Appellate Division. That motion was denied on September 18, 2003.
On December 23, 2003 Dr. Cole filed the present motion seeking to vacate the motion judge's June 20, 2003 order barring the report and testimony of Dr. Lamster. Dr. Cole now claims that the recent Appellate Division decision of Tucci v. Tropicana Casino and Resort, Inc., 364 N.J.Super. 48, 834 A.2d 448 (App.Div.2003) requires the late filing of Dr. Lamster's report and necessitates the vacation of the motion judge's June 20, 2003 and July 25, 2003 orders ruling otherwise. This Court disagrees.

II.

A.
The discovery process serves two important functions: (1) it provides a method for obtaining information that might otherwise be unavailable; and (2) it provides disclosure of the positions and evidence being presented at trial. Vitti v. Brown, 359 N.J.Super. 40, 46-47, 818 A.2d 384, 387-88 (Law Div.2003). However, as is apparent here, if discovery is not pursued promptly and efficiently it can result in significant trial delays. Id. at 47, 818 A.2d at 388.
Prior to the adoption of Best Practices in September 2000, discovery requirements were dealt with in relatively simple terms by R. 4:24-1. Id. at 43, 818 A.2d at 386. According to the pre-Best Practices rules, the parties were to complete their discovery within 150 days of the original complaint's service. This deadline was seldom, if ever, observed. See Notices to the BarReport of the Conference of Civil Presiding Judges on Standardization and Best Practices, New Jersey Lawyer, Aug. 9, 1999, at 34. Consequently, discovery extensions were routinely granted. Ibid. *77 Although good cause was required for such extensions, in fact, virtually any reason sufficed. These haphazard extensions had a devastating effect on trial date certainty. It became commonplace that multiple trial calls were necessary before a case could be readied for trial, and the delays increased the cost of litigation and decreased the public's confidence in our courts. Ibid. In the two decades prior to the adoption of Best Practices, the court system struggled to establish credibility in the face of increasing backlogs and congestion. The court system experimented with programs such as differentiated case management to address these problems. Montiel v. Ingersoll, 347 N.J.Super. 246, 248, 789 A.2d 190, 191 (2001). Different and generally longer discovery periods were permitted under this system, depending on the complexity of the case. Bergen County was one of the vicinages employing differentiated case management. In fact, it was the first. But-differentiated case management failed to meaningfully address the backlog and congestion reflected in New Jersey's civil dockets in the late 1990s. The failure of this case management system was in substantial part the result of the discovery regime hobbled by an almost total disregard for deadlines.
Best Practices[6] arose, in significant part, to address the evident delay in trying cases caused by litigants' failures to complete discovery in a timely fashion. Montiel, supra, 347 N.J.Super. at 253, 789 A.2d at 194. The CCPJ's discovery recommendations were designed to address this paramount concern, and: to ensure an early exchange of information to which the parties are entitled; to relieve an aggrieved party from the burden of having to seek court intervention to compel discovery to which it was entitled; and, to establish consequences for failure to provide discovery as the anticipated rules required. See Notices to the BarReport of the Conference of Civil Presiding Judges on Standardization and Best Practices, New Jersey Lawyer, Aug. 9, 1999, at 34.
The CCPJ recommended that R. 4:24-1 be amended to provide a real "discovery cut-off" once a case was scheduled for a dispositive court eventarbitration or trial. R. 4:24-1(c) as proposed by the CCPJ provided that:
A consensual extension of discovery must be sought prior to the expiration of the discovery period ... If the parties do not agree or a longer extension is sought, a motion for relief shall be filed ... and made returnable prior to the conclusion of the applicable discovery period. The court may, for good cause shown, enter an order extending discovery *78 for a stated period, and specifying the date by which discovery shall be complete ...
Absent exceptional circumstances, no extension of the discovery period may be permitted after an arbitration or trial date is fixed.
The New Jersey Supreme Court adopted R. 4:24-1(c) as proposed by the CCPJ.
Best Practices, though initially controversial, has dramatically increased trial date certaintya vital goal which these reforms were intended to secure. In the Bergen County vicinage, from December 2001 to November 2003, fewer than 0.5% of the cases called for trial were delayed due to a judge's unavailability. Monitoring Trial Certainty in Bergen County, NJ Judiciary Court Management Statistics (Dec. 2001Nov. 2003). Accordingly, Best Practices has helped insure that if counsel is ready to proceed, trial is virtually certain. Trial date certainty has led to more settlements and a dramatic reduction in civil case backlog and congestion.[7]New Jersey Judiciary Court Management Statistics, 1 (Nov. 2003), Bergen County's experience is typical of the results throughout this State. Ibid.

B.
The record before this Court demonstrates that the motion judge was initially and ultimately correct when he barred Dr. Lamster's report and testimony. A trial date had been set for March 31, 2003. Dr. Lamster's report was provided after the March 7, 2003 discovery end date, and it is undisputed that no request was made to extend discovery prior to that date. R. 4:24-1(c) requires that an applicant show exceptional circumstances exist to secure an extension of the discovery end date after discovery has closed and a trial date set. Absent such an extension Dr. Lamster's report cannot be permitted. Smith supra, 360 N.J.Super. at 343-45, 823 A.2d at 69-71 (plaintiff failed to file an application to amend her interrogatories, supported by an affidavit that due diligence would not have provided a much earlier medical re-examination).[8]
The facts presented in Smith supra, 360 N.J.Super. 337, 823 A.2d 65, are similar to those here. In Smith, an automobile negligence case, plaintiff's initial MRIs failed to show either herniated discs or disc bulges. After discovery closed, plaintiff sought to introduce a new expert report containing the results of subsequent MRIs. The proposed report suggested that disc bulges were present in the cervical and lumbar areas of plaintiff's spine. The trial court permitted the late report despite R. 4:24-1(c), *79 finding that no prejudice would result. But the Appellate Division reversed a subsequent plaintiff's verdict finding that R. 4:24-1(c) applied. Since no exceptional circumstances were provided to justify the late filing of the expert report, the Appellate Division found that the trial court had abused its discretion in permitting its receipt. Id. at 345, 823 A.2d at 71.
Exceptional circumstances exist when: (1) counsel is diligent in pursuing discovery during the discovery time period; (2) the additional discovery or disclosure sought is essential to the case; (3) the reason why counsel failed to request an extension of discovery within the original discovery period is provided; and (4) the circumstances surrounding the failure to complete discovery are clearly beyond the control of both the attorney and the litigant seeking the extension Vitti, supra, 359 N.J.Super. at 51, 818 A.2d at 391. If a moving party fails to satisfy any of these minimums, the permission to late file discovery should be denied. Ibid. This is true, in part, because, absent such a showing, it would be difficult to conclude that denying the request would result in "grave injustice." Ibid.
Dr. Cole does not dispute that he submitted Dr. Lamster's report after the discovery end date. Moreover, Dr. Cole makes no showing that he was diligent in pursuing discovery, or that Dr. Lamster's report was essential to the case.[10] Finally, the record reveals no credible reason for failing to request an extension of discovery or that such circumstances were beyond both his and his attorney's control. On the record before it, this Court does not believe that even one of the constituents of exceptional circumstances has been met. Thus, the motion judge ultimately was correct to bar Dr. Lamster's expert report.

C.
Dr. Cole argues that despite the plain dictates of R. 4:24-1(c), Tucci v. Tropicana Casino and Resort, Inc., 364 N.J.Super. 48, 834 A.2d 448 (App.Div.2003) forbids the barring of Dr. Lamster's report and testimony. This Court believes otherwise.
In Tucci, the Appellate Division found that an expert report submitted thirty-nine days after the discovery deadline passed should have been allowed by the motion judge. Id. at 54, 834 A.2d at 451. However, the Appellate Division decision plainly was controlled by the facts presented. There, the plaintiff, in a slip and fall negligence case, sought and received interrogatory answers from the defendants before the December 14, 2001 discovery end date. According to the Appellate Division, when the discovery end date passed, a trial date of May 20, 2002 was assigned. Documents concerning elevator maintenance at the Tropicana Casino and Resort had been requested but were not provided until the non-binding arbitration which took place on December 13, 2001. R. 4:21A.[11] In fact, the plaintiff's attorney did not receive all the maintenance records until the end of January 2002. The plaintiffs claimed that their elevator expert could not begin his work until the maintenance records were made available, and sought a case management conference. The April 24, 2002 conference led to an order extending the time in which the plaintiffs could provide expert reports to May 24, 2002. The trial date was rescheduled for September 9, 2002.
*80 The plaintiffs, however, failed to file the elevator expert's report until July 2, 2002, some thirty-nine days after the close of extended discovery. According to the Appellate Division, the delay was a result of unavoidable scheduling delays. While the plaintiffs clearly should have sought a discovery extension, "a twelfth hour submission of new information amending discovery by one's adversary requiring a reasonable investigation", at least in the eyes of one trial judge, provides the requisite exceptional circumstances. O'Donnell v. Ahmed, 363 N.J.Super. 44, 51, 830 A.2d 924, 928 (Law Div.2003). The Appellate Division said as much:
Surely, plaintiff's attorney might well have sought a further extension of the expert-report deadline. On the other hand, he reasonably relied on the cooperation of his adversaries who made no objection to the expert's inspection of the elevator after the submission deadline. We point out, moreover, that the litigation process cannot effectively take place without some measure of cooperation among adversaries. Clearly the court ought not be unduly applied to for relief that the parties are able to arrange for themselves without prejudice to the justice system. Beyond that, the trial court's concern for the additional discovery by defendants that the expert report would require cannot justify the dismissal with prejudice. The May 14 case management order anticipated the necessity for that additional discovery. Hence, the late report simply delayed that supplementary discovery by thirty-nine days. If the thirty-nine-day delay resulted in an inability of the parties to complete the additional discovery in the more than two months remaining prior to the trial date, then the trial date could have been adjourned.
[Tucci supra, 364 N.J.Super. at 53, 834 A.2d at 451.]
It is in this vein that the Appellate Division's concern about the preclusion of an essential report, which occurred largely without fault, must be examined.
In these circumstances, as we had repeatedly held prior to Best Practices, the ultimate sanction for an attorney's procedural violations of dismissal with prejudice must be a recourse of last resort, not to be invoked unless no lesser sanction is adequate in view of the nature of the default, its attendant prejudice to other parties, and the innocence of the sanctioned litigant. We had been particularly indulgent in not barring a late expert's report where the report was critical to the claim or defense, the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent.
[Id. at 52, 834 A.2d at 450 (citations omitted) (emphasis added).]
In this Court's view, Tucci stands for the unremarkable proposition that, in appropriate circumstances, trial date certainty must yield to fundamental fairness. This calculus is set out in R. 4:24-1(c) as presently drafted. In Tucci exceptional circumstances exist; here they do not.

III.
In sum, this case should proceed to trial without the testimony of Dr. Lamster. The January 26, 2004 trial date is the sixth date set here. Trial date certainty has been made a mockery of, as the parties seek to take advantage of subjective rules which allow the very game-playing which Best Practices was adopted to eliminate. Since no exceptional circumstances have been established, there is no prejudice in *81 denying the defendant's request for rehearing. An order denying the defendant's request for rehearing is enclosed with this opinion.[12]
NOTES
[1] This matter was transferred to the Court following the retirement of Judge Peter F. Boggia.
[2] In pertinent part R. 4:17-4(e) provides:

If an interrogatory requires a copy of the report of an expert witness or treating or examining physician ... the answering party shall annex to the interrogatory an exact copy of the entire report or reports rendered by the expert or physician. ... If the answer to the interrogatory requesting the name and report of the party's expert or treating physician indicates that the same will be supplied thereafter, the propounder may, on notice, move for an order of the court fixing a day certain for the furnishing of that information by the answering party. Such order may further provide that an expert or treating physician whose name or report is not so furnished shall not be permitted to testify at trial.
[3] In pertinent part R. 4:17-7 provides:

[A]mended answers shall be served not later than 20 days prior to the end of the discovery period ... Thereafter, amendments may be allowed only if the party seeking to amend certifies therein that the information requiring the amendment was not reasonably available or discoverable by the exercise of due diligence prior to the discovery end date.
[4] In the interim, the trial date was adjourned from March 31, 2003, to June 23, 2003. On April 3, 2003 and April 4, 2003, respectively, plaintiff served the supplemental expert reports of Drs. Montana and Philips. These reports supported an increase in the amount of special damages sought.
[5] Westphal, was a pre-Best Practices case. There, the Appellate Division relaxed the provisions of the then-existing R. 4:17-7 and permitted late filed discovery. The court found both that the moving party did not intend to mislead the adversary and that prejudice resulted to the opposing party. Westphal is emblematic of pre-Best Practices motion practice respecting the late provision of discovery. However, the Appellate Division's toleration of late filed discovery appears to have changed in light of Best Practices. In Smith v. Schalk, 360 N.J.Super. 337, 343-44, 823 A.2d 65, 69-70 (App.Div.2003), for example, the court declined to sanction the provision of an amended expert report filed well after the discovery end date and shortly before trial. Referring specifically to Westphal, the Appellate Division concluded that it was unlikely that that rationale supporting late discovery survived the adoption of Best Practices. Ibid. No wonder. As the Law Division recently concluded, giving effect to those cases would eviscerate Best Practices, rendering the amended R. 4:17-7 "virtually meaningless." Montiel v. Ingersoll, 347 N.J.Super. 246, 255, 789 A.2d 190, 195 (Law Div.2001). In adopting Best Practices, the Supreme Court recognized that the prior regime increased expenses, exposed trials to delay, and opened the door to gamesmanship, thus defeating a central objective of Best Practicesthe promotion of trial-date certainty. Smith, supra, 360 N.J.Super. at 345, 823 A.2d at 71. The Court notes that the motion judge, in rendering his initial ruling, found that the plaintiff would be substantially prejudiced by the admission of Dr. Lamster's report. This Court agrees with the motion judge in that respect. As noted in the record, the late filed report of Dr. Lamster introduced the new issue of a link between Zadigan's cardiac condition and periodontal disease. Plaintiff apparently was unable to obtain a cardiologist to rebut the issues presented in the tardy opinion.
[6] The New Jersey Judiciary Strategic Planning Committee issued a report to the New Jersey Supreme Court stressing the need for unification and accountability. See Notices to the BarNew Jersey Judiciary Strategic Planning Committee Report to the Supreme Court, New Jersey Lawyer, May 4, 1998, at 47. The committee identified three goals including a calling for "the standardization of operations to provide a uniform system of justice and consistency in quality of service statewide." Ibid. To that end, it was said that the Judiciary must "develop statewide consistency in case management systems for the Civil, Criminal, Family, and Probation Divisions." Ibid. The Conference of Civil Presiding Judges ("CCPJ") was charged with accomplishing that task in the civil arena. See Notices to the BarReport of the Conference of Civil Presiding Judges on Standardization and Best Practices, New Jersey Lawyer, Aug. 9, 1999, at 34. Best Practices, the CCPJ's recommendations to achieving unification and accountability, took several years to formulate. Extensive comment by members of the bar resulted in numerous revisions before finalization of the CCPJ's initial report. Ibid. Best Practices, as recommended by the CCPJ, was approved by the New Jersey Supreme Court and took effect on September 5, 2000. See Notice to the BarCivil Best Practice Rules and Procedures, New Jersey Lawyer, Aug. 7, 2000, at B1.
[7] In 1999, prior to Best Practices, the civil case backlog in New Jersey was listed at 35,181 cases. Superior Court Caseload Reference Guide 1 (July 19992003), Three years after the initiation of Best Practices, civil case backlog significantly decreased to 17,497 cases. Ibid. Likewise, the overall number of active cases pending in New Jersey decreased from 137,259 cases in 1999 to 97,876 cases in 2003. Id. In Bergen County alone, the civil division backlog decreased from 4,247 cases in 1999 to 1,257 cases in 2003. Id. at 5.
[8] The term "exceptional circumstances" has been used relatively infrequently in the rules. Vitti, supra, 359 N.J.Super. at 49, 818 A.2d 384. However, the terms exceptional circumstances and extraordinary circumstances are very similar. As such, the cases interpreting "extraordinary circumstances" are instructive in determining the meaning of exceptional circumstances. For purposes of a showing of "exceptional circumstances," there generally must be some showing that the circumstances presented were clearly beyond the control of the attorney and the litigant seeking an extension of time. An excessive work load, recurring problems with staff, a desire to avoid expense associated with discovery, or any delays arising out of extended efforts to resolve matter through negotiations generally will not be sufficient to justify an extension.
[10] The Court notes that Dr. Cole had previously secured the expert report of Dr. Bell in November 2002. As such, defendant's case would not be placed in jeopardy if Dr. Lamster's report were barred.
[11] The arbitration award led the defendants to request a trial de novo.
[12] The Court takes no position as to any other discovery exchanged between the parties past the discovery end date.