915 A.2d 1053 (2006)
390 N.J. Super. 409
Marie BRUN, Plaintiff-Appellant,
v.
John CARDOSO and Celina Cardoso, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Telephonically argued September 26, 2006.
Decided November 9, 2006.
*1054 Milagros C. Alvarez, Mountainside, argued the cause for appellant (Lord & Kobrin, attorneys; Ms. Alvarez, on the brief).
Steven I. Litvak, Livingston, argued the cause for respondent (Litvak & Trifiolis, attorneys; Mr. Litvak, of counsel and on the brief).
Before Judges KESTIN[1], WEISSBARD and PAYNE.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Once again we face the competing demands of "Best Practices"[2] and the core principle of the judicial system to provide a fair trial on the merits to the litigants for whose benefit the system was designed and is maintained. We are also required to address the circumstances under which a report by a non-testifying witness interpreting a Magnetic Resonance Imaging (MRI) test is admissible pursuant to the business records exception, N.J.R.E. 803(c)(6), and N.J.R.E. 705. In the case under review, plaintiff Marie Brun appeals from the dismissal at trial of her personal injury claim against defendants John and Celine Cordoso. While it cannot be gainsaid that some of the blame for the events leading to the dismissal must be placed on plaintiff's counsel, we conclude that the trial judge failed to consider and employ alternate remedies that would have salvaged plaintiff's case while avoiding prejudice to defendants; as a result, we reverse.
On June 12, 2001, plaintiff had stopped her automobile at the intersection of Morris Avenue and Union Street in Union Township when she was struck from behind by a car operated by defendant John Cardoso and owned by defendant Celina Cardoso.
At the scene of the accident, plaintiff complained to the responding police officer of lower back pain. However, she refused treatment saying that she would see her own doctor after picking up her children from school. A few hours after the accident, plaintiff was taken by her husband to Saint Barnabas Hospital in Livingston to be treated for the back pain.
At Saint Barnabas, plaintiff was given an x-ray, prescribed pain medication, and told to follow up with her private doctor the next day. The following day, she went to see a chiropractor, Dr. Michael A. Corey. Dr. Corey embarked on a five-month course of treatment involving hot and cold compression, electrical stimulation, massages, and physical therapy. Because of continuing complaints about her back, plaintiff was sent by Dr. Corey for an MRI.
*1055 The MRI was administered at Union Imaging Center. In a report, dated July 27, 2001, Dr. Steven Meyerson, a radiologist, opined that the MRI revealed a diffuse disc bulge at L4-L5 with a small annular tear without evidence of neural compression, and an L5-S1 right paracentral herniation mildly indenting the thecal sac and abutting the right S1 nerve root and possibly mildly displacing it posteriorly.
In addition to seeing Dr. Corey, plaintiff was also examined and treated by Dr. Enrique Hernandez, a neurologist, on August 9, 2001. Dr. Hernandez performed an EMG test and found evidence of left S1 nerve root irritation. In a report dated June 2, 2003, he diagnosed a "contusion sprain to the cervical region" and a "contusion injury to the lumbar spine area with left S1 nerve root dysfunction with persistent pain, spasm and loss of mobility."
Although plaintiff had not been involved in any accidents prior to June 12, 2001, she was involved in another accident on December 27, 2001, which also required a hospital visit and a four-month course of treatment with Dr. Corey for back pain.[3]
Plaintiff, who had elected the verbal threshold option on her motor vehicle insurance, alleged a type 6 "permanent injury." N.J.S.A. 39:6A-8a. A permanent injury is defined as a failure of a body part or organ to heal to function normally, and the part "will not heal to function normally with further medical treatment." Ibid. To prove the required injury, plaintiff named Dr. Corey, Dr. Hernandez, and Union Imaging Center as potential expert witnesses in her Form A interrogatory answers. See R. 4:17-1(b). In a report dated February 2, 2004, Dr. Corey opined as follows:
DIAGNOSIS:
The patient has sustained acute sprains-strains to the cervical and lumbar spine as well as shoulder injuries and radiation of pain concomitant [to] permanent disc damage. We have concluded from the examination and x-rays taken that Ms. Brun suffers from a severe traumatic cervical and lumbar sprain with resultant radiculopathy.
These injuries are accompanied by ligaments instability, myositis and localized evidence of nerve root irritation. Ligament and muscle tissue appear myositic and displayed chronic spasm.
Ms. Brun has been diagnosed with acute cervical and lumbar strain sprain with post concussion syndrome. These injures are of a permanent nature because the soft tissue injuries heal with scar tissue, which is neither as elastic or resilient as its undamaged counterparts. Also, there is a possibility of future need for disc herniation surgery. However, conservative treatment i.e. exercise programs and chiropractic care was currently opted for. The surgical option was discussed with Ms. Brun at length and will be considered if the pain gets unbearable.
PROGNOSIS:
The prognosis is guarded in that Ms. Brun has suffered significant limitation of use of her cervical spine and low back which leaves her with great difficulty performing to a great extent her usual daily activities and job requirements without interfering pain. The patient can be expected to have future difficulties with the regions involved. The herniation of the discs can only deteriorate *1056 with time, making surgery the likely future outcome.
In this type of injuries, the soft tissue components, such as muscles, tendons and ligaments heal with scar tissue, which will never be as flexible or elastic as their original counterparts.
This permanent restriction of the range of motion of the neck and low back region, will result in significant limitation of use of her cervical and lumbosacral spine, which will no longer be able to function in a normal manner as it did prior to the accident.
Ms. Brun has injuries to her cervical and lumbar spine, accompanied by pain down her arms and down her legs, which is traumatic in nature. Ms. Brun has severe pain in her neck with dizziness, fainting, post concussion syndrome and headaches. This pain in the neck region is a severe strain-sprain.
She has severe pain in her back. This pain in the back region is a severe sprain-strain. She continued to be bothered by pain to the back. A MRI was taken which showed a bulge at L4-L5 level and herniation [sic] disc at L5-S1 level, which has limited her ability to walk or stand.
She will continue with treatment as needed. She has permanent injuries to her cervical and lumbosacral spine.
. . . .
PERMANENCY:
Neck and lower back pain, stiffness and weather sensitivity. The discs bulge and herniation are permanent and with time will require future surgery. All test[s] such as MRI shows that this patient has permanent injuries.
DISABILITY & OPINION:
As a direct result of the traumatic injuries sustained by Ms. Brun, there were extremes of joint movement with concomitant stretching and tearing of the ligament structure of the cervical and lumbar regions. It appears that this area will be permanently weakened for an indefinite period of time resulting in significant and permanent restricted mobility.
From all the findings known and from re-evaluation after several office visits, it is our conclusion that Ms. Brun has suffered a permanent partial disability as a result of the accident of June 12, 2001. We feel that while continued therapy and treatment is essential, prognosis for full recovery is not possible.
CAUSALITY:
In my opinion, stated with a reasonable degree of medical certainty, the patient's signs and symptoms are causally related to the accident in question.
FUTURE CARE:
In summary, as a result of this accident, Ms. Brun has sustained the injuries noted with the significant limitations noted. In all medical certainty, she will suffer acute serious flare-ups of these conditions in the future that may necessitate further care such as surgical intervention of the discs.
Plaintiff's suit, filed on June 2, 2003, came to trial before a jury on August 12, 2005. Defendants moved in limine to bar or limit Dr. Corey's testimony, particularly concerning the alleged disc herniation and its causal relationship to the June 12, 2001 accident.[4] Plaintiff's counsel had apparently *1057 informed the court that Dr. Hernandez would not be called as a witness. As a result, the judge had ruled that before Dr. Corey could testify as to the MRI findings, a radiologist who was qualified to interpret MRIs would have to be called. In response to the judge's ruling that a radiologist's testimony was a prerequisite to Dr. Corey's testimony, plaintiff's counsel met with Dr. Howard Kessler, the owner of Union Imaging Center. Learning that Dr. Meyerson had not been employed by the Union Imaging Center since July 2002, nearly three years earlier,[5] counsel enlisted Dr. Kessler to testify concerning the July 27, 2001 MRI. Thus, Kessler was present in court on August 12, 2005. It was at this point that the case began to unravel.
On voir dire, without the jury present, Dr. Kessler, who was board certified in radiology and specialized in MRI and CT scan evaluations, testified that he agreed only in part with Dr. Meyerson's interpretation of plaintiff's MRI. Significantly, he believed that at the L4-L5 level there was a disc herniation, rather than the "diffuse disc bulge" read by Dr. Meyerson.
Defense counsel objected to any testimony by Dr. Kessler, who counsel termed "a surprise witness." Counsel argued that Dr. Kessler was seeking, in effect, to present an amended report of Dr. Meyerson, thus constituting him "a new witness." Defense counsel rejected the judge's suggestion that any prejudice could be remedied by having the defense expert, Dr. Bercik, review the "new" testimony in light of the MRI film. The judge was not favorably inclined to plaintiff's suggestion that Dr. Kessler only testify to the single herniation found by Dr. Meyerson, since this might hamper cross-examination. At that point, the judge reviewed the report of Dr. Bercik, noting that, in his initial report of September 29, 2004, he had diagnosed plaintiff with a post-cervical and post-lumbosacral sprains, but had suggested a review of the MRI film. In a supplementary report of January 11, 2005, Dr. Bercik found only mild disc bulging at L4-L5 and L5-S1 and no herniations.
The trial judge decided to let Dr. Kessler testify before the jury, after which she would rule on defense counsel's objections. Dr. Kessler testified to his interpretation of the July 27, 2001 MRI, consistent with his voir dire, although in greater detail. On cross-examination, Dr. Kessler conceded that his interpretation of the film differed from that of Dr. Meyerson.
Having excused the jury, the judge readdressed the defense objection to Dr. Kessler's testimony. At the outset, the judge took note of plaintiff's failure, in the three years since Dr. Meyerson's departure, to comply with Rule 4:17-7 by amending her answers to interrogatories to reflect Dr. Kessler's opinion. Responding to the court's inquiry as to prejudice from Kessler's "new" testimony, defense counsel noted: (1) his inability to depose Dr. Kessler; (2) his inability to cross-examine Dr. Meyerson, "the author of the record,"; and (3) the "new variation to the case" provided by Dr. Kessler. In response, the judge noted counsel's ability to cross-examine Dr. Kessler and to elicit from him the more favorable (to the defense) opinion of Dr. Meyerson. Plaintiff argued that there was no demonstrable prejudice to the defendants since Meyerson's opinion was placed before the jury and the "two herniation" opinion of Dr. *1058 Kessler would not have affected Dr. Bercik's opinion since he only found two bulges and no herniations.
At the outset of her ruling, the judge focused on a number of decisions dealing with late amendments to interrogatory answers. See Gittleman v. Cent. Jersey Bank and Trust Co., 103 N.J.Super. 175, 246 A.2d 757 (App.Div.1967), rev'd on dissent, 52 N.J. 503, 246 A.2d 713 (1968); Falcone v. N.J. Bell Tel. Co., 98 N.J.Super. 138, 236 A.2d 394 (App.Div. 1967), certif. denied, 51 N.J. 190, 238 A.2d 475 (1968); Conde v. Brown, 174 N.J.Super. 351, 416 A.2d 915 (Law Div.1980); Westphal v. Guarino, 163 N.J.Super. 139, 394 A.2d 377 (App.Div.), aff'd o.b., 78 N.J. 308, 394 A.2d 354 (1978).
In reviewing the factors deemed important in the cited cases, the judge found "no intent on plaintiff's part to mislead." She did find "a huge element of surprise." Most importantly, the judge found prejudice to the defendants flowing from counsel's argument that he would have handled the case in a different manner had Kessler's opinion been disclosed prior to trial. The judge was satisfied that "the case cannot go forward at this time," but asked the attorneys to address whether a dismissal or a mistrial was the appropriate remedy.
Defendants argued that the judge was bound to adjudicate the matter based on the proofs adduced, "the facts before you. That's the way it has to be." To grant a mistrial, defendants argued, would permit plaintiff to reconstitute her case with the proper expert testimony, in effect, as the judge said, "like a do over." Plaintiff noted that she had named the Imaging Center in her interrogatory answers and had supplied the MRI report but only found out "recently," during the trial itself, about Dr. Kessler's different conclusion. She noted further that Dr. Corey, having relied on Dr. Meyerson's MRI report, would only testify to one herniation. As a result, counsel argued that the jury should be permitted to "weigh the options." She agreed that it would not be proper to ask Dr. Kessler to testify to one herniation when he believed there to be two.
In ruling, the judge stated:
It is a difficult case in that the facts are so peculiar. If perhaps we had known before the trial started that Dr. Meyerson was not available and Dr. Kessler had looked at the films and [reached a] different conclusion, I would have been in a differentbefore the trial started I could have said let's go call my PJ, it sounds like these people need an adjournment to straighten this late breaking news out. That has not happened here.
Quite frankly, I do the best I can. I analyze it all as best I can. The Appellate Division doesn't often tell me I'm wrong but sometimes I am.
Look, I'm not happy about this either. I mean plaintiff seems to be a very nice lady. I'm not interested inI must sooner it went to the jury and let them figure it out. In fact, it's an easy out for the judge to say oh what the heck. Go to the jury because the chances are 50/50 he's going to win and then he has no appellate issue at all. But I frankly don't think that's what I get paid for. I get paid for making a call and doing the best I can. So I'm going to dismiss the case.
Thereafter, plaintiff moved for a new trial, essentially repeating her earlier argument, adding only that the judge could have "cured" the problem by issuing a curative instruction restricting the jury to the single herniation identified by Dr. Meyerson. The judge denied the motion, referring to the unfairness of requiring defense counsel to "fairly cross-examine" *1059 Dr. Kessler under the circumstances. In the course of her colloquy with counsel, the judge stated:
I know in Union County, we do not let chiropractors read MRIs. I'm aware of case law, but I know it's what we do here. So I would never have let [Dr. Corey] read it and go forward from that. You have to bring someone else to read [the MRI].
We find no fault with the judge's determination that the trial could not fairly proceed under these circumstances. That decision was clearly within her discretion. Mason v. Sportsman's Pub, 305 N.J.Super. 482, 493-95, 702 A.2d 1301 (App.Div. 1997) (citing Clark v. Fog Contracting Co., 125 N.J.Super. 159, 162, 309 A.2d 617 (App.Div.1973) and Westphal, supra, 163 N.J.Super. at 145-46, 394 A.2d 377). While the judge agreed that there was no "design to mislead," she did find "the element of surprise." Westphal, supra, 163 N.J.Super. at 146, 394 A.2d 377. And, while we are inclined to believe that any prejudice, ibid., to defendants could have been cured at the outset, there is no doubt that once the judge decided to have Dr. Kessler testify in front of the jury, there was demonstrable prejudice that could not have been adequately remedied by a curative instruction, as plaintiff suggested, and again suggests on appeal. Having created the problem, it ill behooves plaintiff to glibly dismiss defendants' concerns. Nevertheless, we do not agree with defendants' position, advanced to the trial court and again in oral argument before us, that they were prejudiced because the case would have been evaluated differently by their insurance carrier for settlement purposes, i.e., the case was worth more with two herniations than with one. While a reality, that fact is not the type of prejudice that the case law addresses. Prejudice in this context concerns the ability of a party to fairly prosecute, or defend against, the allegations on their merits. We also note our disagreement with the trial judge's related suggestion that prejudice might result from jury compromise. The judge put it this way:
Well the jury could say Dr. Kessler said two herniations. She seems like a nice lady. What the heck? Let's cut the thing in half and we'll give her one herniation, and decide that way.
Such reasoning amounts to little more than speculation.
Having decided that the trial could not go forward as postured, the judge was faced with the need for a remedy, either a mistrial or a dismissal with prejudice. She chose dismissal as the appropriate response. Although not specifically articulated, the judge may have been motivated by the fact that a mistrial would allow plaintiff to avoid the consequences of adherence to the interrogatory amendment time limits that Best Practices were intended to enforce. See Smith v. Schalk, 360 N.J.Super. 337, 344-46, 823 A.2d 65 (App.Div.2003); Montiel v. Ingersoll, 347 N.J.Super. 246, 252-55, 789 A.2d 190 (Law Div.2001). Nevertheless, while pre-2000 case law may no longer be fully viable in light of the Best Practices amendments, Smith, supra, 360 N.J.Super. at 343 n. 1, 823 A.2d 65; Montiel, supra, 347 N.J.Super. at 252-53, 789 A.2d 190, it remains "apparent that the interests of justice standard continues fully viable under Best Practices and that time constraints will yield to exceptional circumstances and fundamental litigation fairness." Pressler, supra, comment 1.1 to R. 4:17-7. See Tucci v. Tropicana Casino & Resort, Inc., 364 N.J.Super. 48, 834 A.2d 448 (App.Div. 2003); Ponden v. Ponden, 374 N.J.Super. 1, 863 A.2d 366 (App.Div.2004), certif. denied, 183 N.J. 212, 871 A.2d 90 (2005). The situation facing the trial judge called *1060 for resolution of these competing goals. The judge selected the strict enforcement option. We disagree.
The situation presented here does not precisely mirror the facts of the several reported cases that have struggled to accommodate Best Practices with "fundamental litigation fairness." Here, plaintiff's conduct, while not deserving of admiration, did not smack of gamesmanship as, for example, in Smith, supra, 360 N.J.Super. at 345, 823 A.2d 65. Plaintiff was faced with the departure of Dr. Meyerson from Union Imaging Center, an event that occurred during the long pre-trial period. Counsel first learned of Dr. Meyerson's absence shortly before trial in response to the judge's in limine ruling that the MRI report could only be introduced through the testimony of a physician qualified to interpret an MRInot a chiropractor. Up to then she apparently believed that she could have Dr. Corey testify to his reliance on the MRI report, N.J.R.E. 702. In the absence of any case law directly on point, we cannot say that counsel's belief was unreasonable. It was only when counsel met with Dr. Kessler that she learned of his divergent opinion. While we do not condone counsel's apparent failure to immediately advise the court and her adversary of the change, we view the circumstances as unique, unforeseen and largely unforeseeable.
Faced with these facts, the judge should have aborted the trial immediately rather than having Dr. Kessler testify before the jury. The necessity for a mistrial was compelling, but a dismissal with prejudice was, in our view, unwarranted. See Smith, supra, 360 N.J.Super. at 346, 823 A.2d 65 (ordering a new trial where non-compliance with Best Practices prejudiced defense); see also Mason, supra, 305 N.J.Super. at 493-95, 702 A.2d 1301. The judge could have considered the assessment of actual costs, including counsel fees, as a condition of proceeding again, as suggested in Oliviero v. Porter Hayden Co., 241 N.J.Super. 381, 385-91, 575 A.2d 50 (App.Div.1990), an authority that clearly survives Best Practices.
This was not a case where the excluded evidence was secondary or trivial; rather, once Dr. Kessler was excluded, Dr. Corey was out and the case was over. While the trial judge sought to follow the rules and our sometimes inconsistent case law, we conclude that she erred. A new trial will be required.
Finally, we note another matter of concern. In denying plaintiff's new trial motion, the judge referred to a "rule" in the county of trial that a chiropractor may not testify to an MRI interpretation. It was apparently that same "rule" that led to the attempt to call Dr. Kessler in place of Dr. Meyerson. We disapprove of any such county "rule." Indeed, it was the existence of such local procedural rules that led to enactment of uniform Best Practices. If local procedural rules were to be avoided, local rules resolving substantive issues are, a fortiori, unacceptable. Judges presented with an issue of substantive law must resolve it on their own, guided by applicable rules and our precedents interpreting them. A judge may not make a ruling based on some consensus among the judges sitting in that particular county.
That said, we agree with the judge that, on objection, interpretation of an MRI may be made only by a physician qualified to read such films, and that the MRI report could not be bootstrapped into evidence through Dr. Corey's testimony. Our conclusion is not dependent on Dr. Corey's status as a chiropractor but on the complexity of MRI interpretations. While there are numerous cases that support the admission of medical reports under the *1061 business records exception to the hearsay rule, N.J.R.E. 803(c)(6), see, e.g., State v. Gardner, 51 N.J. 444, 461-62, 242 A.2d 1 (1968); Falcone, supra, 98 N.J.Super. at 148, 236 A.2d 394, in State v. Matulewicz, the Court made it clear that it is "the degree of complexity of the procedures utilized in formulating the conclusions expressed in the [expert's] report" that determines its admissibility under the business records exception. 101 N.J. 27, 30, 499 A.2d 1363 (1985). We have held that before introducing complex medical reports pursuant to N.J.R.E. 803(c)(6), the ability of the opposing side to cross-examine the author of such a report must be assured. Nowacki v. Cmty. Med. Ctr., 279 N.J.Super. 276, 282-83, 652 A.2d 758 (App. Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995). In Nowacki, we held that it is "clearly established that medical opinions in hospital records should not be admitted under the business records exception where the opponent will be deprived of an opportunity to cross-examine the declarant on a critical issue such as the basis for the diagnosis or cause of the condition in question." Ibid.
Thus, Matulewicz and Nowacki provide a basis for denying the admission of Dr. Meyerson's MRI report under the business records exception, because of the complexity of reading MRIs and diagnosing damage to the back and spine. Lambert v. R.R. Ret. Bd., 929 F.2d 1197, 1199 n. 4 (7th Cir.1991); See also Jamshid Tedhranzadeh, M.D., Carol Andrews, M.D., Edward Wong, M.D., Lumbar Spine Imaging: Normal Variants, Imaging Pitfalls, and Artifacts, 38 Radiologic Clinics of N. Am., No. 6, 1207 (2000); Claude Pierre-Jerome, M.D., Ph.D., Arzu Arslan, M.D., Svein Ivar Bekkelund, M.D., Ph.D., MRI of the Spine and Spinal Cord: Imaging Techniques, Normal Anatomy, Artifacts & Pitfalls, 23 J. of Manipulative & Physiological Therapeutics, Vol. 3, 470, 475 (2000). Indeed, in the present case three qualified physicians all read plaintiff's MRI in different ways, showing the nuanced difficulty inherent in interpreting such images. Additionally, as noted, admitting Dr. Meyerson's MRI report without calling him as a witness would deprive defendants of the ability to cross-examine the author of the report on the central issue of the case, namely plaintiff's herniation, in contravention of Nowacki. In those circumstances, Dr. Meyerson's MRI report was, on objection, inadmissible hearsay.
Despite the status of Dr. Meyerson's report, plaintiff repeatedly argues that N.J.R.E. 703 and Macaluso v. Pleskin, 329 N.J.Super. 346, 747 A.2d 830 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000), allow the admission of Dr. Corey's testimony, since expert testimony may be based on the opinions of a non-testifying expert. However, we have cautioned that expert testimony should not be used as "a vehicle for the `wholesale [introduction] of otherwise inadmissible evidence.'" State v. Vandeweaghe, 351 N.J.Super. 467, 481, 799 A.2d 1 (App.Div. 2002) (quoting State v. Farthing, 331 N.J.Super. 58, 79, 751 A.2d 123 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000), aff'd on other grounds 177 N.J. 229, 827 A.2d 1028 (2003)). More specifically, in Day v. Lorenc, 296 N.J.Super. 262, 267, 686 A.2d 1193 (App.Div.1996), we held that while a physician could be questioned about the report of another doctor that he had taken into consideration in formulating his opinion, N.J.R.E. 705, the report of the non-testifying doctor could not itself be admitted in evidence "in the absence of an independent basis for admissibility." Id. at 267, 686 A.2d 1193. In Macaluso, supra, 329 N.J.Super. at 354, 747 A.2d 830, upon which defendants rely, a treating chiropractor referred the plaintiff to a neurologist and an orthopedic surgeon, who each *1062 ordered diagnostic tests and rendered diagnoses of plaintiff's condition. The chiropractor testified to the diagnoses of the other two doctors, which he deemed "consistent with his own independent findings." Ibid. In holding that there was no error in permitting this testimony, the court relied on N.J.R.E. 703 and cases permitting one expert to testify "to the opinion of a non-testifying expert on which the testifying expert relied in reaching his or her conclusion." Id. at 355, 747 A.2d 830. See State v. Alexander, 7 N.J. 585, 83 A.2d 441 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 638, 96 L. Ed. 1326 (1952); Glowacki v. Underwood Mem'l Hosp., 270 N.J.Super. 1, 17, 636 A.2d 527 (App.Div.1994); Blanks v. Murphy, 268 N.J.Super. 152, 162, 632 A.2d 1264 (App.Div.1993); Dietzeman v. Peterson, 196 N.J.Super. 96, 101, 481 A.2d 596 (Law Div.1984).
In Glowacki, although the testifying physician was permitted to state that her diagnosis was based in part on a conversation with a radiologist concerning plaintiff's MRI, the witness was herself an orthopedic surgeon who independently reviewed the MRI in question. Glowacki, supra, 270 N.J.Super. at 10, 636 A.2d 527. In Blanks, the hearsay information related by the testifying expert was contained in a hospital record already in evidence, 268 N.J.Super. at 162-64, 632 A.2d 1264, and, most importantly, the included hearsay "was a straightforward observation of a treating physician which was not unfairly prejudicial to plaintiff in any respect." Id. at 164, 632 A.2d 1264. Dietzeman concerned only statements made to an examining physician by plaintiff, which assisted the doctor, an orthopedic surgeon, in confirming a diagnosis of a disc herniation, a conclusion he had already reached based on diagnostic tests including a CT scan and x-rays. 196 N.J.Super. at 98-101, 481 A.2d 596. None of the cases is similar to the matter under review and none sanctions the admissibility of testimony by Dr. Corey as to the MRI interpreted by Dr. Meyerson. While we conclude that Glowacki, Blanks, and Dietzeman, as well as Macaluso, are all factually distinguishable from the present case, we believe that Nowacki, which we have discussed earlier, is most on point in the circumstances presented here.
It appears that Dr. Corey's opinion on the plaintiff's injuries would have been substantially reliant on Dr. Meyerson's interpretation of the MRI films, which was the subject of considerable dispute. Allowing Dr. Corey to testify as to the plaintiff's herniation would have been to permit the admission of the non-admissible hearsay of a non-testifying expert. This attempted circumvention of the Evidence Rules was properly denied by the trial judge. To repeat, this determination is not because the witness was a chiropractor.[6] The same result would have obtained if the witness were a medical doctor unqualified to interpret an MRI.
Reversed and remanded for a new trial.
NOTES
[1] Judge Kestin did not participate in oral argument. However, with the consent of counsel he has joined in this opinion. R. 2:13-2(b).
[2] Best Practices refers to the 2000 rule amendments "which demanded stricter compliance with the discovery time frames than theretofore." Pressler, Current N.J. Court Rules, comment 1.1 on R. 4:17-1 (2007).
[3] In a supplemental report of March 12, 2005, Dr. Corey performed an analysis pursuant to Polk v. Daconceicao, 268 N.J.Super. 568, 575, 634 A.2d 135 (App.Div.1993), comparing the injuries from the two accidents. Defendants make no claim that Dr. Corey's report was not sufficient in that regard.
[4] At several points the transcript refers to matters that were earlier ruled upon by the judge, apparently the day before testimony began. We have not been provided with a transcript of those proceedings. As a result, the chronology of events is somewhat muddled. We emphasize the necessity of having a record determination on all matters of substance and the necessity of supplying that record on appeal, if relevant to matters at issue, as here.
[5] Dr. Kessler subsequently testified that Dr. Meyerson still lived in New Jersey. Plaintiff never sought to explain why she did not seek out Dr. Meyerson.
[6] Dr. Corey was, of course, otherwise qualified to render an opinion as to the permanency of plaintiff's injuries. N.J.A.C. 13:44E-1.1; Afram v. Heller, 380 N.J.Super. 545, 549-51, 883 A.2d 407 (App.Div.2005). We express no opinion as to whether plaintiff's disc bulges, without any herniations, could qualify as a permanent injury under N.J.S.A. 39:6A-8(a). See Dabal v. Sodora, 260 N.J.Super. 397, 399-401, 616 A.2d 1297 (App.Div.1992).